**Lynn Murphy CREEL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–84–00054–CR.**

Court of Appeals of Texas,
San Antonio.

April 30, 1986.

David R. Weiner, David M. Garcia, San Antonio, for appellant.

Sam Millsap, Jr., Raymond E. Fuchs, Bruce Baxter, Sam Ponder, Edward Shaughnessy, III, Crim. Dist. Attys., San Antonio, for appellee.

Before BUTTS, CANTU and REEVES, JJ.

## OPINION

CANTU, Justice.

The conviction is for capital murder. Punishment was assessed at imprisonment for life.

The evidence developed at trial [1] reflects that Irene Plangman, a recent divorcee, met the appellant, a married man, sometime in July or August of 1980. Within a few weeks of their introduction Plangman bought some pearls from appellant. Shortly thereafter, following appellant's separation from his wife, he and Plangman had become sexually intimate.

This relationship, described as stormy by Plangman, continued off and on into 1981.

Early in 1980 Plangman had become acquainted with Joan Smith, the wife of the deceased, through some business dealings. As a result of this meeting Plangman befriended Joan Smith, and lived with the Smiths for a short time.

Sometime in 1981 a jewelry transaction took place between Plangman, Joan Smith and appellant. Appellant owned three pieces of gold jewelry which Plangman agreed to sell for appellant. Plangman showed the jewelry to Joan Smith who immediately expressed an interest in purchasing the items. Mrs. Smith was able to only

1. We acknowledge the use of much of appellant's counsel's exhaustive presentation of facts in his brief.

raise $500.00 of the $1,400.00 purchase price.

Plangman gave this money to appellant who became immediately disenchanted by the failure of the Smiths to pay the balance. Appellant then wrote Plangman a check for the $500.00 to be returned to Mrs. Smith in exchange for his jewelry. According to Mrs. Smith the balance was to be worked out with Plangman through a mutual sale of antique items.

Appellant became angry and resentful over the matter of the jewelry sale and over Plangman's friendship with Mrs. Smith in general.

For about a month prior to the date of the alleged offense, the Smiths had been offering for sale their lake front property located in Mico in Medina County. Sometime in October of 1981 Mrs. Smith informed Plangman about the proposed sale of their Mico property and requested that Plangman remove her antique furniture from the storage unit located on the property. As a result of the conversation Plangman took appellant to the Smith house at Medina Lake during the week of October 21 and removed her belongings from the storage unit. Appellant assisted her with his van.

A week or two before Wilson Smith's disappearance and while Plangman was staying with the Smiths, Plangman became furious when Mrs. Smith asked her whether she could account for some missing jewelry belonging to her. Plangman was contacted later by a detective and asked if she would be willing to take a polygraph test. Plangman agreed to do so but insisted that Mrs. Smith also be polygraphed. The relationship became strained.

Joan Smith testified that on the evening of October 20, 1981, she received a telephone call from an unidentified female person inquiring about the lake front property which was for sale. Mrs. Smith had her husband handle the call.

Julie Woodley testified that she was contacted by appellant on October 20, 1981 about making a phone call as a potential buyer for some land. Appellant requested her to set up a meeting with the owners of the property. According to Woodley, appellant wanted to talk to the people who owned the property about some money they owed him.

After making the call to the Smith residence, Woodley, following appellant's instructions, arranged to meet Mr. Smith at a cafe in the Medina Lake area at 10:00 a.m. the next day. Later that evening, according to Woodley, appellant contacted her to ascertain that the meeting had been arranged.

Mrs. Smith testified that her husband left their home in his brown Oldsmobile station wagon on the morning of October 21, 1981 at 9:26 a.m. to meet the party who had called the previous evening. Mr. Smith had in his possession at the time he left, a diamond ring with the initials "WJS," a diamond cluster ring with a stone encircled by six other diamonds, a gold Seiko watch and a solid gold pen and pencil set.

Plangman testified that appellant called her early on the afternoon of October 21, 1981, wanting to come by and talk to her. When appellant arrived, appellant told her that he had Wilson Smith in his van and that he wanted her assistance and advice in deciding what to do with Smith. Plangman claimed disbelief in appellant because of prior boasts of a similar nature. Nevertheless, she refused to help appellant and appellant declared "he would handle things himself."

When Plangman suggested that if appellant was being truthful about Smith, he should release him, appellant became enraged and exclaimed "that he wasn't going to spend the rest of his life in jail for kidnapping someone and then talking about it later." At that point Plangman finding some possible truth in appellant's claims felt that Smith was still alive.

Appellant left but called Plangman later that afternoon to tell her he had placed Smith in a storage unit. According to Plangman, appellant further related that when he checked the storage unit he found that Smith had gotten loose and was beat-

ing on the door screaming for help. Appellant also related that Smith had managed to free himself partially while in the back of the van and had tried to climb out.

The next morning appellant called Plangman very early and, referring to Smith, told her "Well it's all over. It's finished" and "Don't feel sorry for him. He was a bastard to the end."

According to Plangman, appellant told her how he had waited for Smith at "the house" and how he had taken a curtain from the wall to put around Smith's shoulders as they left the house. Appellant then put Smith in his own station wagon and drove to a wooded area behind the house where Smith was transferred to appellant's van.

Plangman testified that, while referring to Smith, appellant had remarked, "what happened to a person as they got older, did they just give up a fight to live, or did they just not care, or did they just become hard and—refused to fight for life."

Plangman testified that she had called Joan Smith and had inquired about Mr. Smith. Mrs. Smith, according to Plangman, did not appear to be concerned about Mr. Smith thus causing Plangman to disbelieve what appellant had been telling her about Mr. Smith.

Plangman expressed her disbelief to appellant who then became annoyed.

On the morning of October 23, 1981 appellant called Plangman. During this conversation, appellant told Plangman that she had caused him to be paranoid, and that he had returned to the scene of the crime where he injured his leg while crawling through heavy brush. Appellant told Plangman that "everything was as he had left it."

Appellant was arrested on November 24, 1981 for alleged outstanding traffic violations. Thereafter, he was transferred to Medina County where he was jailed on charges of robbery and kidnapping.

A few days before the arrest, Plangman and her mother had occasion to borrow appellant's van to run an errand to a stor-

age unit which Plangman had leased. In the side pocket on the door of the van Plangman found a white envelope which contained a man's watch, a ring, and a pen and pencil set. She recognized the ring, a man's initial diamond ring, as the same one she had seen many times on the hand of Wilson Smith.

When Plangman showed appellant what she had found, he told her that he had not intended that she find the items and that he had planned to sell them.

Al Cuellar, a Texas Ranger, became involved in the investigation of Smith's disappearance shortly after Mrs. Smith reported the disappearance. It was Mrs. Smith that gave Cuellar the names of Plangman and appellant as possible suspects.

On November 18, 1981, Cuellar interviewed Plangman at the Castle Hills Police department after Plangman was drawn there under a pretext that a case involving one of her children was being investigated. Plangman provided Cuellar with initial information into the disappearance and eventually became Cuellar's chief source of information. Thereafter both maintained continuous contact with each other through January of 1982. As a result of the information supplied by Plangman appellant became a prime suspect in the case. Indeed much, if not most, of the evidence marshalled against appellant was obtained either directly or indirectly from Plangman.

Plangman related to Cuellar, appellant's boast that he had marched Smith out of the lake house with a curtain draped around him. In the course of his investigation, Cuellar had already found a curtain inside of Smith's station wagon. This indicated to Cuellar that only the killer or one to whom the killer had confided the facts of the killing could have known about the curtain.

Charles Goodnough, IV, testified that he was employed by Zale's Jewelry Store at a local mall at the time appellant sold him a ring on or about October 26, 1981. Goodnough described the ring, for which he paid $300.00, as a man's white gold ring with six stones clustered around a single center

stone. He identified a ring displayed in a jewelry catalog as being similar to the one he purchased from appellant. Mrs. Smith identified the same ring in the catalog as being like the ring that belonged to her husband and which he was wearing at the time of his disappearance.

Randal Graham, an admitted methamphetamine addict, testified that he visited appellant at his house at 2 o'clock A.M. about one month before appellant's arrest. Graham described appellant as acting schizophrenic and having delusions that the FBI was watching him. Graham claimed that appellant requested his help in disposing of a body. According to Graham appellant stated, "I've killed a man and I've got his body in the back of the van, and I need you to help me get rid of it." Both Grahams declined to help appellant and left. Graham's wife corroborated her husband's testimony regarding appellant's conversation.

On December 11, 1981, while appellant remained jailed, Cuellar obtained Plangman's permission to search appellant's van which was parked at Plangman's place. At the time of the search Plangman had with her a general power of attorney from appellant authorizing her to act on his behalf in any legal matter.

The search of the van yielded only some brittle rope fibers similar to some found in the Smith's station wagon and to some on a rope found hanging in the barn at the Smith's lake house.

Extensive testimony was elicited from Plangman concerning communications with appellant while he was incarcerated in the Medina County Jail from November 24, 1981 through February 17, 1982. The majority of these communications were in the form of letters written by appellant to Plangman and hand delivered to her, either directly by appellant or by others. Some of these letters Plangman turned over to appellant's former attorney. Those that Plangman kept were turned over to the State's attorney.

Plangman testified that after appellant was incarcerated in the Medina County Jail appellant began to ask her to change her last name to Creel so that it would appear that they were married and to prevent her from testifying against him. Some time about December 6, 1981 appellant informed Plangman that it was extremely important that they establish a marital relationship.

Plangman testified that the letters from appellant were written in code to convey instructions on how to dispose of Smith's body. She explained how the term "fence posts" was being used to refer to Smith's body. According to Plangman's interpretation of appellant's letters, an individual named David Wolf was to see that Smith's body was destroyed by chemicals. Plangman stated that appellant directed her to carry information to Wolf about buying acids and pouring them over the body.

In a letter dated December 10, 1981, appellant in discussing the subject of acids and chemicals advised Plangman that she was not to undertake the job herself, but that she should give the instructions to her "brother" (Wolf).

One other letter instructed Plangman to have Wolf contact Woodley at her place of work. Appellant wanted Wolf to tell Woodley that she should make no statement to anyone. According to the instructions Wolf was not to contact Woodley until the "fence post job is successfully completed," which meant not until the body was dissolved.

In letters dated December 21, 1981, December 23, 1981 and January 4, 1982, appellant once again referred to Wolf disposing of the body and urged Plangman to push Wolf into talking to Woodley. References to marriage were also made in these letters.

At the same time appellant urged Plangman to try to obtain false backdated receipts for auto parts so that he could explain the presence of his fingerprints in Smith's station wagon should any ever be found. Although the record does not disclose what efforts were made, Plangman was never able to obtain such receipts.

Plangman testified that after appellant learned about the search of his van appel-

lant communicated with her about trying to get the power of attorney he had given her declared illegal based on a claim that he and Plangman were not married. Appellant further instructed her to inform his then attorney that she had not consented to the search of appellant's van by Cuellar.

David Wolf, testifying as a State's witness, stated that Plangman had contacted him after appellant's arrest. He stated that Plangman gave him a map which was written on a small piece of paper and which she told him was from appellant. Wolf stated he threw the map away after looking at it. About a week later a second map was brought to him by Plangman which he read and then threw away. Wolf described the map as depicting two roads, IH–10, and two buildings, the northern one having an "X" marked on it.

Plangman, Wolf continued, also brought him a letter from appellant which dealt with dissolving "fence posts," which he understood to mean a body. The letter referred to pouring a mixture of acids over a body or on the ground.

According to Wolf, Plangman asked him at least eight times to go out to the location and dispose of the body. Plangman finally stopped asking him when Wolf made up a story about having gone to the location and being stopped by police for trespassing.

Jay Martinez, a cellmate of appellant at the Medina County Jail during the months of November and December of 1981, testified about conversations with appellant concerning the disposing of bodies.

Martinez, a native of New York with Italian ties, possessed a degree in chemistry. Appellant became interested in how the Mafia disposed of bodies in the New York area. Martinez related that he told appellant about a method of disposing of bodies which involved a combination of nitric and sulfuric acid called aqua regia, and acidic acid. According to Martinez, this information was discussed in the theoretical context of how to dispose of the carcass of an animal. Martinez noted that appellant was persistent in asking him about the combination of acid needed to form the aqua regia solution.

On January 5, 1982, the Medina County Grand Jury returned indictments for the offenses of aggravated robbery and aggravated kidnapping alleged to have been committed on Wilson James Smith on or about October 21, 1981.

Ranger Cuellar testified that he repeatedly asked Plangman about the whereabouts of Smith's body and that she repeatedly insisted that she did not know.

On January 6, 1982, Cuellar called Plangman and arranged to meet her at the parking lot of a Wendy's Restaurant. At the meeting Cuellar continued to question Plangman about her knowledge of the location of the body. At some point in their conversation, Plangman said, "Just head this way, just take off," or "Let's just drive." At Plangman's directions Cuellar drove to IH–10 then continued north until they reached a point in northwest Bexar County where Plangman stated "Go on the Beckman exit." Cuellar exited and turned around the access road until Plangman told him to stop.

The location where they stopped appeared to be a rural residence in disrepair with the appearance of being abandoned. Plangman then suggested that the possibility existed that the body was in one of the barns on the premises. Plangman insisted that she did not know that the body was buried there. She, however, explained that she led Cuellar to that particular location because it was one of the places she had been to with appellant.

The following day, Cuellar went onto the property pointed out by Plangman. After entering one of the barns and poking around for a few minutes, Cuellar raised a piece of plywood and smelled a strong odor which he recognized as that of a decomposed human. Cuellar returned to the scene later that day accompanied by a "crime lab" team.

Plangman, returning from the Medina County Jail, rushed to the location to find Cuellar. She arrived just before the dig-

ging began. When she heard that the body had been found, she spontaneously exclaimed, "I did it." Plangman explained that her statement at the scene was caused by the emotional stress and shock associated with finding the body. She repeatedly denied that she had anything to do with the killing, the burying of the body, or the whereabouts of the burying.

Plangman testified that she received a letter from appellant dated January 7, 1982, in which he stated, "I can't believe this is happening. I saw they found the body." In a letter dated January 29, 1982, appellant wrote of the need to "point conclusively to Jo Ann Smith ...". In another letter appellant again mentioned the subject of obtaining false receipts for automobile parts. Letters dated January 26, 1982 and February 2, 1982 expressed heightened interest in Woodley and Wolf. As to Woodley, appellant wrote "I would rather for her not to testify if possible."

In subsequent letters appellant emphasized to Plangman the importance of changing her driver's license to his name to keep "them" from taking possession of his van. Appellant warned Plangman, "Do not go in the van for any reasons."

Appellant's letters of February 6 and 8 sought to find out from Wolf if he had or had not visited the location shown on the map previously drawn by appellant and delivered to Wolf by Plangman. Once again, in a letter dated February 14, 1982, appellant wrote of having the power of attorney declared illegal and of asking Woodley to not testify.

On February 17, 1982, Plangman and appellant were married by proxy while he was incarcerated in the Medina County Jail. According to Plangman appellant wanted to marry her because he loved her and so that she could not testify against him. Plangman testified that she married appellant only to "save his neck."

Appellant was released from the Medina County Jail sometime in March of 1982. By November of 1982 Plangman had filed for divorce. The divorce was obtained on January 28, 1983. The decree, however was not signed until February 15, 1983.

On March 3, 1983, Plangman encountered appellant at a 7–11 convenience store in San Antonio. She stated that appellant pushed her into his van and verbally abused her because of the divorce. In Plangman's words, appellant was "driving wildly down the street" while saying "Now is the time. I've reached that decision. There's no other way. I want you to understand, I have to kill you. I cannot take the chance of you testifying against me." Plangman also noted that appellant pleaded and demanded that they remarry.

Dr. Vincent DiMaio, the chief medical examiner for Bexar County, testified in great detail with respect to an autopsy that was actually conducted by a deputy medical examiner who was no longer with the medical examiner's office.

DiMaio related that the body autopsied was that of a severely decomposed, partially skeletonized adult male. The body was encrusted in sixty-eight pounds of dirt and pebbles. Running across the lower part of the partially skeletonized face and covering the mouth was a silver-colored duct tape. The nose area was not covered by the tape,[2] and the nose and ears appeared to have been eaten away. Upon removal of the tape from the mouth, a piece of knotted red cloth was seen to have been wedged into the mouth. The autopsy, however, did not reveal any evidence of trauma such as fractures or bullet holes.

The hands of the deceased were taped together in front of the body with silver-gray duct tape. The feet were tied together by two loops of a white tan cloth. A forty-three inch length of white tan cord was draped across the anterior upper and lower legs and across the lower abdomen.

2. DiMaio believed that the ragged appearance of the tape around the nose was consistent with a rodent having chewed away on the tape while eating the nose. He nevertheless conceded that it was possible that whoever put the tape around the head of the deceased might have deliberately left the nose exposed so that he could breathe through it.

Some evidence that the deceased was suffering from moderate coronary artery disease was observed.

DiMaio testified further that the body autopsied was in a state of decomposition consistent with someone having been in the ground from October 22, 1981 until January 6, 1982. He expressed the opinion that the manner of death was "homicide," based upon the fact that the person was bound, the mouth stuffed with a gag, and the hands and feet tied and bound. Due to the extreme state of the body's decomposition, the exact means of death could not be ascertained.

DiMaio admitted that it was possible that the death of Smith was caused by heart failure but insisted that he would still classify the death as a homicide.

According to DiMaio, the gag found stuffed in the mouth of the deceased was more dangerous than the tape wrapped around the head because such a gag, he believed, typically works its way back to block the airway preventing breathing and eventually causing death by choking. DiMaio could not say that Smith had in fact choked on the gag.

The identification of Smith was accomplished through comparison of dentures removed from the body and turned over to Dr. James Catone and Dr. Dennis Miller.

Dr. Miller, a dentist, testified that he treated Smith in 1973 and made a set of upper and lower plates for him. Dr. Miller identified the dentures he received from Dr. Catone as being the ones that he made for Smith. He also identified the jaw bones he received from Dr. Catone as being those of Smith.

Dr. Catone, a forensic dentist, stated that he received some jaw bones and partial dentures from the medical examiner's office and he in turn delivered them to Dr. Miller.

Comparisons between x-rays of the teeth of Smith taken in 1973 and x-rays made by Catone of the teeth submitted to him by the medical examiner's officer were positive. Dr. Catone expressed the opinion that the dentures and the jaw bones which he examined were those of Smith.

On April 6, 1983, a Bexar County Grand Jury indicted appellant for the capital murder of Smith.

The two paragraphed indictment alleged in pertinent part:

... on or about the 21ST day of OCTOBER, A.D., 1981, LYNN MURPHY CREEL, hereinafter styled the defendant, while in the course of committing and attempting to commit the offense of kidnapping upon an individual, namely: WILSON JAMES SMITH, hereinafter styled the complainant, did intentionally cause the death of the complainant, in a location unknown to the Grand Jurors, and by manner and means unknown to the Grand Jurors, and the deceased body of the said complainant was thereafter found in Bexar County, State of Texas;

*Paragraph II*

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present in and to said Court that on or about the 21ST day of OCTOBER, A.D., 1981, and anterior to the presentment of this indictment, LYNN MURPHY CREEL, hereinafter styled the defendant, while in the course of committing and attempting to commit the offense of robbery upon an individual, namely: WILSON JAMES SMITH, hereinafter styled the complainant, did intentionally cause the death of the complainant, in a location unknown to the Grand Jurors and by manner and means unknown to the Grand Jurors, and the deceased body of the complainant was thereafter found in Bexar County, Texas; ...

Appellant raises six grounds of error including a Speedy Trial contention. We address the Speedy Trial contention last.

Appellant's second ground of error raises the contention that the evidence is insufficient to support a finding beyond a reasonable doubt that the death of the deceased was intentionally caused. The argument advanced is that none of the evidence of-

fered by the State constituted direct evidence that Smith's death was *intentionally* caused and that the circumstantial evidence relied upon by the State was inconclusive and legally insufficient to prove the essential element.

TEX.PENAL CODE ANN. § 6.03(a) (Vernon 1974) defines intentionally in the following manner:

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

In addition the Penal Code provides:

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. TEX.PENAL CODE ANN. § 6.04(a) (Vernon 1974).

In reviewing the sufficiency of the evidence on appeal, this Court is required to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. State,* 672 S.W.2d 801 (Tex.Crim.App.1984) (en banc); *Carlsen v. State,* 654 S.W.2d 444 (Tex. Crim.App.1983) (en banc).

■ In a circumstantial evidence case a conviction cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of guilt of the accused, *Carlsen v. State, supra; Johnson v. State,* 673 S.W.2d 190 (Tex. Crim.App.1984) (en banc) or if the evidence leaves any reasonable doubt as to the guilt of the accused, *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) because if the evidence supports an inference other than the guilt of the accused, a finding of guilt beyond a reasonable doubt is not a rational finding. *Carlsen v. State, supra.*

■ In reviewing the evidence in a circumstantial evidence case it is not required that every fact point directly and independently to the guilt of the accused, it being sufficient that the cumulative force of all the incriminating circumstances establishes the guilt of the accused. *O'Pry v. State,* 642 S.W.2d 748 (Tex.Crim.App.1982) (en banc); *Stogsdill v. State,* 552 S.W.2d 481 (Tex.Crim.App.1977); *Flores v. State,* 551 S.W.2d 364 (Tex.Crim.App.1977).

Moreover each circumstantial evidence case must be tested by its own facts to determine the sufficiency of the evidence to support a finding of guilt and a judgment of conviction.

■ In such cases, as in the instant case, where there are inculpatory circumstances amidst the evidence, the court is not at liberty to treat such as anything other than as what they are and then upon that basis inquire if there is a reasonable hypothesis other than guilt which also accounts for such inculpatory circumstances. *See Allen v. State,* 651 S.W.2d 267 (Tex.Crim.App. 1983) (en banc); *Girard v. State,* 631 S.W.2d 162 (Tex.Crim.App.1982). Thus any hypothesis that fails to account for the inculpatory circumstances cannot be a reasonable one.

■ Intent can be inferred from the acts, words, and conduct of the accused. *Romo v. State,* 593 S.W.2d 690 (Tex.Crim. App.1980); *Beltran v. State,* 593 S.W.2d 688 (Tex.Crim.App.1980).

■ When we view those acts, words and conduct of the accused in light of the numerous incriminating circumstances which permeate the record herein we cannot say the evidence does not exclude every other reasonable hypothesis except that of appellant's guilt.

Appellant points to the testimony of the medical examiner in search of a reasonable hypothesis. He points out that the medical examiner could not rule out the possibility that Smith died as a result of heart failure or that he choked to death.

Appellant also characterizes his inculpatory statements as being incapable of supporting an inference of an intentional killing because the statements fail as unequivocal admissions of guilt. While agreeing that the statements are not unequivocal confessions we regard them as damning admissions against interest.

A confession is defined as an acknowledgment of guilt of the crime charged or of the facts which constitute the crime. An admission, on the other hand, acknowledges some particular fact or circumstance [and not the whole charge] and indicates a consciousness of guilt which tends to connect the accused with the crime charged and to incriminate him. In other words, an admission acknowledges only some particular fact or circumstance, pertinent to the issues and tending to prove guilt in connection with other circumstances, while a confession covers the whole transaction and admits guilt. *See generally Whorton v. State*, 69 Tex.Crim.R. 1, 152 S.W. 1082 (1913).

We do not agree that these admissions, when considered with the other circumstances tending to connect appellant with the offense charged, do not support an inference of guilt. We believe that the element of intent finds sufficient support in the cumulative weight of all the circumstances proved. Moreover, we are convinced that the totality of the circumstances as developed sufficiently show that appellant consciously engaged in conduct with the objective and desire to specifically cause the death of Smith. Appellant's challenge to the sufficiency of the evidence is overruled.

Appellant's third ground of error complains of trial court error in submitting to the jury, over timely objection, a theory of the offense not supported by the evidence, that is that the death of Smith was intentionally caused in the course of committing or attempting to commit the offense of robbery.

His fourth ground of error contends that the trial court reversibly erred in overruling his motion to compel the State to elect as to which paragraph of the indictment would be submitted to the jury. We address both contentions together.

Prior to submission of the court's charge to the jury at the guilt-innocence phase, appellant moved to require the State to elect as to which of the two paragraphs of the indictment the State would rely on. Alternatively, appellant objected to the court's submission to the jury of the theory that the murder was committed in the course of committing or attempting to commit the offense of robbery. Both motions were overruled by the trial court. Thus the jury was instructed to find appellant guilty of capital murder if they found that appellant intentionally caused the death of Smith either in the course of committing or attempting to commit the offense of kidnapping upon Smith or in the course of committing or attempting to commit the offense of robbery upon Smith.

The jury returned a general verdict finding appellant guilty of capital murder.

The gist of both of appellant's grounds of error is that the evidence is insufficient to support a conviction under the paragraph alleging a robbery.

Appellant does not, however, challenge the sufficiency of the evidence to convict him under the kidnapping paragraph in the indictment.

We begin with general proposition that the charge must correspond to the allegations in the indictment finding support in the evidence. *Benson v. State*, 661 S.W.2d 708 (Tex.Crim.App.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984); *Booker v. State*, 523 S.W.2d 413 (Tex.Crim.App.1975). Thus reversible error can occur if the court's charge permits conviction on a theory not supported by the evidence. *Savant v. State*, 544 S.W.2d 408 (Tex.Crim.App.1976). *See also Fite v. State*, 139 Tex.Cr.R. 392, 140 S.W.2d 848 (1940).

Thus, where alternative theories are submitted to the jury and a general verdict is returned, the conviction will be upheld if the evidence is sufficient to support either

theory. *Bailey v. State*, 532 S.W.2d 316 (Tex.Crim.App.1975); *Tapley v. State*, 673 S.W.2d 284 (Tex.App.—San Antonio 1984, pet. ref'd).

■ Moreover, if there is sufficient evidence to support the submission of both theories, the State is not required to elect which theory it wishes to have submitted to the jury. *Vasquez v. State*, 665 S.W.2d 484 (Tex.Crim.App.1984) (en banc); *Franklin v. State*, 606 S.W.2d 818, 821 (Tex.Crim.App. 1978).

■ The question before us then is, whether there is sufficient evidence in the record to support the State's contention that Smith was intentionally killed by the appellant while in the course of committing or attempting to commit either kidnapping or robbery. Since no challenge is made to the proof of murder while in the course of kidnapping there can be no error in accepting a general verdict which finds support under that theory. Even in the absence of a challenge we are constrained to find more than abundant evidence to support a conviction under that theory.

Nevertheless, we address appellant's narrow challenge to the robbery theory.

A brief reflection upon the evidence heretofore laid out reveals that appellant was irritated over what he felt was an attempt, by the Smith family, to cheat him out of the return of jewelry or the payment therefor. There is also evidence that appellant arranged to have one of the Smiths meet with him at the lake house in order to resolve the pending dispute. Moreover, there is evidence that appellant was in possession of personal items of jewelry belonging to Smith and that he in fact sold a ring belonging to the deceased.

Robbery is defined as follows:

(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code and with intent to obtain or maintain control of the property, he:

(1) intentionally, knowingly, or recklessly causes bodily injury to another; or

(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

TEX.PENAL CODE ANN. § 29.02(a)(2) (Vernon 1974).

We hold that there is sufficient evidence to show that appellant murdered Smith while appellant was in the course of committing or attempting to commit theft while additionally intending to obtain or maintain control of property belonging to Smith.

Appellant's third and fourth grounds of error are overruled.

Ground of error number five asserts that the trial court committed reversible error in denying his requested jury instruction on the lesser included offense of murder under section 19.02(a)(3) of the Penal Code.

Section 19.02(a)(3) the felony murder rule provides:

(a) A person commits an offense if he:

\*　　\*　　\*　　\*　　\*　　\*

(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

Appellant submitted the following requested charge:

## I.

If you find from the evidence beyond a reasonable doubt that the defendant is guilty of either capital murder or murder, but you have a reasonable doubt as to which offense he is guilty, then you must resolve that doubt in defendant's favor and find him guilty of the lesser offense of murder.

If you should find from the evidence that defendant is not guilty of capital murder or murder, or if you have a reasonable doubt whether defendant is

guilty thereof, then you will acquit him and say not guilty.

## II.

Our law provides that a person commits murder if he intentionally or knowingly or recklessly commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual while the person so acting is committing or attempting to commit a felony or is in immediate flight from the commission or attempt to commit such felony.

## III.

You are further advised that the offense of murder may also be committed if a person intends to cause serious bodily injury and unlawfully commits an act clearly dangerous to human life that caused the death of another.

'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.

## IV.

Now if you find from the evidence beyond a reasonable doubt that on or about the 21st day of October, 1981 in Bexar County, Texas, at the time and place in question, the defendant, LYNN MURPHY CREEL, did, with intent to cause serious bodily injury, unlawfully commit an act clearly dangerous to human life that caused the death of WILSON SMITH, to wit kidnapping him, then you will find the defendant guilty of murder, but not capital murder.

## V.

If you find from the evidence beyond a reasonable doubt that defendant is either guilty of capital murder or guilty of murder, under the instructions herein given to you, but you have a reasonable doubt as to which of said offenses he is guilty,

then you should resolve that doubt in defendant's favor and find him guilty of only the lesser offense of murder.

\* \* \* \* \* \*

TEX.CODE CRIM.PROC.ANN. art. 37.-09 (Vernon 1981) provides:

An offense is a lesser included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

■ In determining whether a charge on a lesser included offense is required, a two step analysis is to be used. First, the lesser included offense must be included within the proof necessary to establish the offense charged. Next, there must be some evidence in the record that if the defendant is guilty he is guilty of only the lesser offense. *Aguilar v. State*, 682 S.W.2d 556 (Tex.Crim.App.1985); *Royster v. State*, 622 S.W.2d 442 (Tex.Crim.App. 1981).

In determining the existence of the second requirement, an examination of the entire record must be made. *Lugo v. State*, 667 S.W.2d 144 (Tex.Crim.App.1984) (en banc); *Eldred v. State*, 578 S.W.2d 721 (Tex.Crim.App.1979).

■ When evidence from any source raises an issue that a lesser included offense may have been committed and a jury charge on the issue is properly requested the issue must be submitted to the jury. *Hunter v. State*, 647 S.W.2d 657 (Tex.Crim. App.1983) (en banc); *Moore v. State*, 574 S.W.2d 122 (Tex.Crim.App.1978).

■ In determining whether an instruction on a lesser included offense should be given the credibility of evidence and whether it is controverted or conflicts with other evidence in the case is not considered. *Moore v. State, supra.*

■ In the instant case there is no serious contention that a homicide did not occur. Moreover, the only suggestion that the homicide was not a murder arises from appellant's argument that the medical examiner's testimony *permits an inference* that death of the deceased occurred other than intentionally and that the expert witness' testimony suggests causes of death inconsistent with an intentional killing. Appellant is careful to avoid the suggestion that the record contains evidence of other than an intentional killing.

These then are the inferences which appellant argues provide the evidence that shows that if appellant is guilty he is guilty only of the lesser included offense.

Appellant did not testify, nor did he present defensive evidence. Thus the only evidence conceivably favorable to appellant exists as a result of cross examination of State witnesses.

We must determine if these inferences and conjectures (surmises) are such evidence as can raise the issue that appellant, if guilty, is guilty only of the lesser included offense of felony murder.

An inference has been defined as a conclusion drawn by reason from premises established by proof; also, a deduction or conclusion from facts or propositions known to be true. 2 BOUVIER'S LAW DICTIONARY (8th ed. 1914).

The law requires that "some evidence" of guilt of the lesser offense exist before a lesser included offense is appropriate. Some evidence must be more than a mere surmise or a mere scintilla of evidence. It must be that from which a jury might reasonably infer the existence of the alleged fact. In the instant case the inferences and conjectures which appellant categorizes as "some evidence" amount to nothing more than a mere surmise or suspi-

cion of the existence of the fact sought to be established. In our opinion such testimony, in legal contemplation, falls short of being "some evidence." *Cf. Joske v. Irvine,* 91 Tex. 585, 44 S.W. 1058 (1898).

Our examination of the entire record discloses only evidence of an intentional killing. *Santana v. State* (Tex.Crim.App., No. 68,930, delivered Apr. 9, 1986) (en banc). Thus appellant has failed to meet the second prong in *Royster v. State, supra.* The trial court did not err in denying the requested charge on the lesser included offense. *De La Rosa v. State,* 658 S.W.2d 162 (Tex.Crim. App.1983) (en banc); *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 175 (1983). Appellant's fifth ground of error is overruled.

Appellant's sixth ground of error claims that the trial court erred in refusing his requested jury instruction submitting the factual issue whether Irene Plangman was an accomplice witness whose testimony required corroboration.

At the conclusion of the testimony, prior to submission of the court's charge, appellant submitted his written requested instructions. Included in the requested instructions was a charge on the issue of whether Plangman was an accomplice witness as a matter of fact. The requested instruction was denied.

It is axiomatic that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense. TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979).

An accomplice witness is an individual who has been shown to have participated with the accused in the commission of the crime for which the accused is on trial. *Robinson v. State,* 656 S.W.2d 111 (Tex. App.—San Antonio 1983, pet. ref'd).

■ In determining whether a person was a participant in an offense, it is proper to look to events before, during and after the commission of the offense, including actions which show an understanding and common design to do a certain act. *Harris*

*v. State*, 645 S.W.2d 447 (Tex.Crim.App. 1983) (en banc).

A witness is not an accomplice witness if he cannot be prosecuted for the same offense of which the accused is charged. *Gonzales v. State*, 681 S.W.2d 270 (Tex.App.—San Antonio 1984, no pet.). And mere presence at the scene of an offense is not sufficient participation to render the witness an accomplice witness. *Villarreal v. State*, 685 S.W.2d 449 (Tex. App.—San Antonio 1985, pet. granted). Nor will failure to disclose the commission of the offense to law enforcement officials make a witness an accomplice witness. *Brown v. State*, 640 S.W.2d 275 (Tex.Crim. App.1982); *Caraway v. State*, 550 S.W.2d 699 (Tex.Crim.App.1977).

Neither will participation by the witness in an extraneous offense arising out of the charge pending against the accused render a witness an accomplice witness requiring corroboration. *May v. State*, 618 S.W.2d 333 (Tex.Crim.App.1981), *vacated*, 454 U.S. 959, 102 S.Ct. 497, 70 L.Ed.2d 374 (1981), *aff'd on remand*, 632 S.W.2d 751 (Tex.Crim.App.1982) (en banc).

When the evidence raises a question as to whether a witness is an accomplice the trial court should charge the jury on the question of whether the witness was an accomplice as a matter of fact. *Harris v. State, supra.*

Appellant insists that the record raised the issue of whether Plangman was at least a party to the offense charged against him. He points to the following in the record to support his assertion, and we reproduce his argument in its entirety:

> Plangman repeatedly denied that she had anything to do with the disappearance and death of Wilson James Smith. The evidence, however, especially the conflicts presented by Plangman's own testimony, points very strongly to a different conclusion.
>
> Prior to the victim's disappearance, Plangman became furious over Joan Smith's insinuation, if not accusation, that Plangman had something to do with her missing jewelry. Plangman was even asked to submit to a polygraph examination in the matter. Earlier in the same week that Wilson Smith disappeared, Plangman made a trip with appellant to Smith's house in Mico, where she had been many times, purportedly to remove the items she had stored there. The record reflects that Plangman knew the Smith's unlisted phone number; the most likely explanation for appellant's knowledge of the phone number is that Plangman disclosed it to him. In addition, Plangman claimed that appellant told her on the day that Smith disappeared that he had placed Smith in a storage unit; the only evidence in the record pertaining to storage units showed that Plangman had leased a number of such units and that she had borrowed a key to a storage unit belonging to the Smiths.
>
> Plangman did not voluntarily contact the police to reveal what she supposedly knew about the disappearance of Smith. When she was finally interviewed by Ranger Cuellar at a time when she had become a suspect, Plangman mentioned that Smith had been marched out of his house by appellant with a curtain draped around him. To Cuellar, only a person whom the killer had told or the killer would have known about the curtain.
>
> The State elicited extensive testimony with regard to letters written by appellant to Plangman while appellant was in the Medina County Jail, including the fact that appellant used a code to describe the plan for dissolving the deceased's body. Yet, it was Plangman who testified that she did not know whether she or appellant initiated the code, implying that it could have been *her* idea to use a code. And it was Plangman who showed great interest in disposing of the body by persistently asking David Wolf (a total of about eight times) to go to the location described by appellant and dispose of the body.
>
> The evidence most probative of Plangman's possible complicity in the offense

charged against appellant was that which surrounds the events of January 6 and 7 of 1982, when the body was discovered. It is undisputed that after directing Cuellar to a location in northwest Bexar County, Plangman pointed to the building on the property and told Cuellar to check, because the body might be in one of the barns. When she returned the following day and heard that the body had been found, Plangman made a spontaneous admission of her involvement in the crime: 'I did it.' On at least one occasion after she led him to the body, Plangman engaged in sexual intercourse with Cuellar, the law enforcement official in charge of the investigation. Plangman, of course, had been one of the prime suspects in the case at the outset of the investigation.

Before the trial court is required to charge the jury on the question of whether the witness was an accomplice as a matter of fact there must be a conflict in the evidence bearing on the status of the witness due to the extent of participation by the witness. *Brooks v. State*, 686 S.W.2d 952 (Tex.Crim.App.1985) (en banc); *Singletary v. State*, 509 S.W.2d 572 (Tex.Crim. App.1974).

We do not believe that the record shows that Plangman was criminally connected with the killing of Smith. In examining the foregoing recitation of evidence relied upon by appellant we note the repeated use of such terms as "the most likely explanation," "could have known," "implying that," and "possible complicity."

The evidence relied upon by appellant to create the conflict necessary for the submission of an instruction on accomplice as a matter of fact thus appears to arise from conclusions, suppositions and implications found by appellant in the evidence rather than upon testimony of witnesses. Even if Plangman's problem with Joan Smith can be labelled a motive for causing the death of Smith, such would not make Plangman an accomplice. *Morgan v. State*, 171 Tex. Cr.R. 187, 346 S.W.2d 116 (1961); *Washburn v. State*, 167 Tex.Cr.R. 125, 318

S.W.2d 627 (1958), *cert. denied*, 359 U.S. 965, 79 S.Ct. 876, 3 L.Ed.2d 834 (1959).

Neither would Plangman's visit to the Smith's lake house prior to the date of the offense make her an accomplice to the crime committed at that location. *Brooks v. State*, 686 S.W.2d 952 (Tex.Crim.App. 1985).

Plangman's knowledge of Smith's unlisted phone number, a fact not available to the general public, is not sufficient to render her an accomplice. *Morgan v. State*, *supra*.

Furthermore, her failure to disclose the extent of her knowledge regarding appellant's criminal actions and her subsequent untruthfulness regarding the extent of her knowledge does not make her an accomplice. *Caraway v. State*, 550 S.W.2d 699 (Tex.Crim.App.1977). Nor will lying to law enforcement officers during the investigation of the offense make the liar an accomplice witness. *Brown v. State*, 640 S.W.2d 275 (Tex.Crim.App.1982); *Flores v. State*, 491 S.W.2d 144 (Tex.Crim.App.1973).

Finally, Plangman's statement, "I did it," to Ranger Cuellar on January 7, 1982 must be examined in the context in which it was uttered.

Cross examination of Plangman reveals the following:

(Defense Attorney): He had accused you of being a suspect?

Plangman: He had not accused me.

Q: You told him at the outset you did it?

A: That was the day that the body was found and I became emotional. He knew better than that.

Q: On the day the body was found you told Ranger Cuellar you had killed Mr. Smith?

A: That was during emotion. Like I said, when I thought that he was there and they said they had found the body, and I said, 'you know'—good—well— he—he said he would meet me and talk to me. And when I—he came to me that they'd found the body it was such a shock and I went there. I don't deny that. And—I had asked him a favor.

Q: Asked who a favor?

A: Al Cuellar.

Q: Was this before or after you told him that you killed Mr. Smith, Irene?

A: I did not kill Mr. Smith. Lynn Creel killed him.

Q: You told him.

A: But he knew I was just popping off, just saying it, because I felt like he had betrayed me.

Q: The point is, just yes or no: Did you tell Ranger Cuellar, 'I killed Mr. Smith?'

A: I didn't say I killed him. I said, 'I did it.'

Q: You said, 'I did it.'

A: Yes. But he knew I didn't, and I didn't.

Q: Regardless of whether anybody knew anything, you said, 'I did it,' and by that you mean, 'I killed Mr. Smith,' right?

A: I don't know what I meant. I was in shock, but I did not kill Mr. Smith and I had nothing to do with it.

Q: Did you tell Ranger Cuellar—

A: Yes, I did. I told you I did. In a moment of emotions there and shock, yes, I did, but he knew it wasn't true, and then everybody else knew it wasn't true—that was there.

Q: Why in the world would you tell—

A: I don't know. I guess I must be the craziest woman in town.

Q: The body had just been found?

A: Yes.

Q: You were in a very emotional state, right?

A: Because I had asked Al a favor that—

Q: Al?

A: Cuellar.

Q: Okay, were—you and Al were standing out there by the body and Al asked—

A: We were not standing beside the body. I never went near a body.

Q: Al just told you the body had been found?

A: He said that they had reason to believe it was there. They had not—nothing had been found at that time.

Q: And you were in an emotional state?

A: Yes.

Q: And you said, 'I did it?'

A: Yes, I did say that. But I didn't do it, and he knew I didn't do it, and so did everyone else that was there.

Q: I understand that's what you're telling us now, but isn't—

A: And they knew that then, too. I told them that, too, after I had calmed down. There was never any question about it. It was all a state of emotional shock.

Q: Sometimes people tell the truth in emotional moments, don't they?

A: Mr. Conaway, it was not the truth, and it has never been doubted.

Appellant relies upon *Harris v. State, supra,* to support his argument of entitlement to an accomplice charge. We do not, however, think *Harris* is controlling. In that case, the witness alleged to be an accomplice, created significant conflicting evidence about her role in the murder through her own testimony. Moreover, her version of the facts was riddled with inconsistencies and significant gaps concerning crucial events.

While it is true that Plangman's statement "I did it" does evidence "consciousness of guilt" standing alone, it does not do so when considered in the context in which it was made. Plangman was not a suspect at the time of its utterance nor was the statement taken seriously at the time it was heard by investigating officers.

Yet if the statement constitutes a circumstance tending to prove that Plangman participated in the crime charged against appellant, it is but the sole circumstance doing so, and we do not believe that when taken in connection with all the evidence adduced a showing is made that Plangman participated with appellant in the murder of Smith to any extent which could make her amenable to prosecution as a principal. Nor do we think a factual issue is raised. We hold that the trial court did not err in

refusing to charge the jury on Plangman's complicity as a matter of fact. Appellant's sixth ground of error is overruled.

Appellant's first ground of error complains of the trial court's overruling of his Motion to Set Aside the Indictment for Failure to Comply with the Speedy Trial Act.[3]

Appellant was indicted in Bexar County on April 6, 1983 in Cause No. 83–CR–0929 for the Capital Murder of Smith which was alleged to have occurred on or about October 21, 1981 in the course of the commission and attempted commission of robbery and kidnapping of Smith. The State filed its written announcement of ready on this indictment on April 6, 1983.

Appellant filed a motion to quash the indictment in Cause No. 83–CR–0929 and the State decided to reindict the case to satisfy the motion to quash which sought greater particularity. The motion to quash was thus never heard or ruled on by the trial court.

Appellant was reindicted in the instant Cause No. 83–CR–2345 on September 14, 1983. The State did not file a written announcement of ready under the new indictment. Neither did the State announce ready at appellant's arraignment on the new indictment on September 22, 1983.

After hearing evidence at a pretrial hearing, the trial court overruled appellant's Speedy Trial motion.

The crux of appellant's argument centers around the actions of the Medina and Bexar County law enforcement officials in obtaining their respective indictments against appellant.

The crucial question raised by appellant's contention revolves around the phrases "criminal action" and "offense arising out of the same transaction." All parties agree, however, that the "criminal action" commenced on November 24, 1981, when appellant was arrested for the aggravated robbery and aggravated kidnapping of Wilson James Smith.

The Texas Speedy Trial Act provides, in pertinent part:

Sec. 1. A court shall grant a motion to set aside an indictment ... if the State is not ready for trial within:

(1) 120 days of the commencement of a criminal action if the defendant is accused of a felony; ...

TEX.CODE CRIM.PROC.ANN. art. 32A.02, § 1 (Vernon Pamp.1986).

Section 2 of the Act provides that if the defendant is either detained in custody or released on bail or personal bond to answer for the same offense or any other offense arising out of the same transaction prior to the filing of an indictment, the criminal action "commences" when he is arrested.

Section 4 of the Act provides ten categories of time periods which are to be excluded from computing the time by which the State must be ready for trial. Article 32A.02, § 4(1)—(10).

In *Barfield v. State*, 586 S.W.2d 538 (Tex.Crim.App.1979) it was held that "[O]nce the defendant files his motion to dismiss for failure to adhere to the provisions of the Act, the State must declare its readiness for trial then and at the times required by the Act."

 Furthermore, the State's announcement of ready is a *prima facie* showing of conformity to the Act, but the defendant may rebut this showing by evidence demonstrating that the State was not ready for trial during the Act's time limits.

 Moreover, if the State is not ready for trial within 120 days of the commencement of the action, the burden is on the State to prove its entitlement to exclusions of time under section 4 of article 32A.02. *Smith v. State*, 659 S.W.2d 828 (Tex.Crim. App.1983) (en banc).

The question before the trial court at the hearing on appellant's motion and before this Court on appeal is whether the State met its burden of proving entitlement to exclusions of periods of time. Although the contention before us presents numer-

---

3. TEX.CODE CRIM.PROC.ANN. art. 32A.02 (Vernon Pamp.1986).

ous unique questions, some of first impression, we decline to address them inasmuch as we believe that the course we take renders their resolution one of pure academic interest.

The State urged in the trial court and reurges on appeal that the Speedy Trial Act is in conflict with at least two provisions of the Texas Constitution and as a result is unconstitutional. We agree with the State that the Act is in conflict with Art. III § 35 of the Texas Constitution which provides:

No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which monies are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof, as shall not be so expressed.

The caption to the Speedy Trial Act (S.B. 1043) reads as follows:

An Act relating to a speedy trial of criminal cases; amending the Code of Criminal Procedure, 1965, as amended, by adding Chapter 32A, by adding Articles 17.-151 and 28.061, and by amending articles 29.02 and 29.03; providing for an effective date; and declaring an emergency.[4]

Relying upon *Ex parte Crisp*, 661 S.W.2d 956 (Tex.Crim.App.1983) the State argues that the Act's caption fails to give readers fair notice of the subject matter contained in the bill and that the caption violates that portion of Article III, § 35 which prohibits the placement of more than one subject in a single bill.

We agree with the State that the caption of the Act suffers the same infirmities suffered by the Controlled Substances Act in *Crisp*.

■ If *Crisp* is correctly decided, then the caption in the Speedy Trial Act stating that the bill is one "relating to a speedy trial of criminal cases" requires the same

demise. A statement, in a caption, that a given bill "relates" to something must be insufficient to satisfy the notice requirements of Art. III, § 35. *Ex parte Crisp, supra.*

■ Additionally, we believe that the caption also violates that provision of Art. III, § 35 which prohibits the placement of more than one subject in a single bill. The addition of Article 17.151 to the Texas Code of Criminal Procedure in the same bill thus groups the Speedy Trial Act with changes to the bail provisions of the Code. Under no stretch of the imagination can it be said that the bill embraces but one subject unless we agree that the one subject encompassed is the entire Code of Criminal Procedure. We sustain this contention as well.

We find it unnecessary to unduly lengthen this opinion by engaging in a full blown discussion on the pros and cons regarding constitutionality of the Act. The matter, it seems, has been thoroughly hashed out in *Stewart v. State*, 699 S.W.2d 695 (Tex.App. —Waco 1985, pet. pending); *Wright v. State*, 696 S.W.2d 288 (Tex.App.—Fort Worth 1985, no writ) and *Beddoe v. State*, 681 S.W.2d 114 (Tex.App.—Houston [14th Dist.] 1984, pet granted). We align ourselves with the reasoning and holding in *Stewart v. State, supra* and the dissenting view in *Wright v. State, supra.* Thus in doing so we dispose of appellant's Speedy Trial contention without need to address the merits of the alleged violation. We do so knowing full well that an error on our part may result in a remand to this Court for addressing the Speedy trial contention. Nevertheless, we feel that forebearance on our part outweighs the need to address what amounts to more likely than not a moot question or the giving of an advisory opinion. Believing that the Act is unconstitutional we overrule appellant's first ground of error without specifically addressing his contention.

In the absence of error calling for reversal the judgment of the trial court is affirmed.

4. Acts 1977, 65th Leg., p. 1970, ch. 787.