**David BROOKS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68718.**

Court of Criminal Appeals of Texas, En Banc.

March 27, 1985.

---

Carolyn D. Hobson, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Alvin M. Titus, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

Appellant was indicted for capital murder. A jury found appellant guilty and during the punishment phase of the trial answered the second special issue in the

negative.[1] Punishment was assessed at life.

In his first ground of error, appellant argues that the trial court erred in denying his request to instruct the jury to disregard the testimony from Sharon Renae Bolt in that she was his common law wife. Article 38.11, V.A.C.C.P. Out of the presence of the jury, Sharon Renae Bolt, also known as "Squeaky," testified in response to defense counsel's questions that she lived with appellant from February of 1979 to August, 1979. Bolt testified that during this period they held themselves out to be husband and wife and she felt they were married. Thereafter during the State's examination she equivocated and testified that she and the appellant were not really married, and that she never really considered herself to be his wife, but they told people they were married so people would not harass them about their interracial relationship. The trial court ruled that Bolt would be allowed to testify.

During her testimony in front of the jury, Bolt again testified on cross-examination that she and appellant agreed to live in a "common-law relationship," that they did cohabit, and that they held themselves out to the public as man and wife. However, she did not testify that she and appellant agreed to be husband and wife. At the conclusion of her lengthy testimony the defense counsel requested that the jury be instructed not to consider the testimony of Bolt because of the existence of a common-law marriage. The court denied defense counsel's request. However, pursuant to appellant's request the court's charge to the jury did define the term "common-law marriage" and did instruct the jury not to consider Bolt's testimony if they found that a common-law marriage did exist.

 The elements of a common-law marriage are an agreement between legally eligible individuals presently to become husband and wife, a living together pursuant to the agreement and cohabitation as husband and wife, and a holding out of each other to the public as husband and wife. *Hightower v. State,* 629 S.W.2d 920, 924 (Tex.Cr.App.1981); *Bodde v. State,* 568 S.W.2d 344, 352 (Tex.Cr.App.1978); *Chatman v. State,* 513 S.W.2d 854 (Tex.Cr.App. 1974). A claim of common-law marriage is closely scrutinized by the courts and the agreement of marriage should be specific on both sides. *Hightower v. State,* supra; *Chatman v. State,* supra. It appears from prior case law that the proper procedure in handling the issue of the existence of a common-law marriage between a defendant and a witness is to submit the issue to the jury. *Bodde v. State,* supra; *Krzesinski v. State,* 169 Tex.Cr.R. 178, 333 S.W.2d 149 (1960). If, however, the evidence is uncontroverted that a common-law marriage existed, the trial court should properly instruct the jury to disregard the proffered testimony. The trial judge in the instant case followed the former procedure. The jury members as finders of fact were allowed to evaluate Bolt's testimony and determine for themselves whether she was appellant's common-law wife. We find no error in the trial court's failure to instruct the jury to disregard Bolt's testimony. Appellant's first ground of error is overruled.

Because appellant challenges not only the sufficiency of the evidence to support the conviction, but the sufficiency of the evidence to corroborate the accomplice witness testimony, we will summarize the evidence as it was introduced at trial.

Officer A. Steve Riser of the Houston police department testified that at approximately 7:50 a.m. on August 13, 1979, he responded to a call and found the deceased lying on his back in the 500 block of Hadley. The deceased had been shot twice, once in the back of the head and once in the back of his left shoulder blade area. His right shirt pocket had been torn from his shirt and the front cloth of the pocket was laying beside the deceased. Lying near the deceased was a pair of glasses, a pen, a

---

1. The second special issue reads as follows:
"Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, David Brooks, would commit criminal acts of violence that would constitute a continuing threat to society?"

metal social security card, various personal papers and a pack of cigarettes. The deceased's pants pockets had been turned inside out and Riser could find no money or wallet on the body. Although papers lying near the body bore the name Charles Mason, Riser testified that further investigation revealed that the deceased's name was Charles Mason Machecek.

Viola Wiley, also called "Dirty Red," testified that on the evening of August 12, 1979, she rode for several hours with her former boyfriend James Lewis, otherwise known as "Diamond," a driver for the Yellow Cab Company. At one point during the evening they picked up appellant and Murray Gardner. Appellant told Diamond that one of his "ladies" was in jail and he needed to make some money in order to get her out. Wiley testified that Lewis drove appellant and Gardner to a club. Appellant said he had to run in the building and take care of some business and he told Lewis to let him out and then drive around the block. Both men got out of the car and Lewis pulled in beside a building in order to turn around. After approximately five minutes, Gardner came running back to the cab. Wiley then heard two shots and saw appellant running back to the cab. When appellant got back inside the cab, he produced a key to a bus station locker. Lewis drove the group to the Greyhound Bus depot. Appellant and Gardner entered the depot but soon returned and asked Lewis to drive them to the Continental Trailways Bus depot. Appellant and Gardner entered the depot and soon came out bearing a beige suitcase. Wiley testified she also saw appellant carrying a wallet. Appellant and Gardner put the suitcase in the back seat of the cab and then Gardner asked Lewis to drop him off at the Act II motel. Lewis dropped Gardner off and then drove appellant to a motel on Alameda. Appellant paid Lewis a $10.00 bill and some change. Appellant then took the suitcase and the wallet and got out of the cab.

Sharon Renae Bolt, an eighteen year old prostitute, testified that she had been living with appellant since February of 1979. On the morning of Sunday, August 12, 1979, she was arrested for impeding traffic. Appellant came to visit her that evening in jail and told her he would get the money to get her out of jail. On Monday afternoon, she was released from jail after appellant paid her fine. After leaving the jail they got into a cab and appellant pulled some traveler's checks out of a black leather wallet and he told her he had to get an ID made so that he could cash them. Appellant told her that he had killed a man the prior evening and taken the traveler's checks and wallet from the victim. Appellant told her that he and Murray Gardner had seen the man walking down the street and had shot him twice in the back of the head. Appellant told her that after shooting the victim, they jumped into a cab for their getaway. Bolt testified that the name written on the traveler's checks was "Charles Wyddick".[2] After leaving the jail, they drove to a passport photograph studio where appellant had an ID made with his picture and Charles Machacek's name printed on it. Appellant then made several attempts to pass the traveler's checks at several motels and hotels. He succeeded in cashing one at the Holiday Inn on South Main. Appellant and Bolt then went back to their room at the Pioneer Motel. When Bolt entered the room she saw the victim's beige suitcase and the gun appellant had used, a .22 caliber pistol. Appellant and Bolt stayed at the Pioneer Motel for three more days. They then moved to the Thunderbird Motel where appellant registered as Charles Machacek. They only stayed there for one day because Bolt read in the newspaper that Charles Machacek was found dead. When they learned that the victim had died, appellant tore up the ID and the traveler's checks and threw them away. Fearful that they might be discovered they moved to the Sessions Motel. The night before appellant was arrested, approximately two weeks af-

---

2. Although Bolt testified at this point that the name on the traveler's checks was Charles Wyddick, her testimony later on reflected that the name was actually Charles Machacek.

ter the murder, Bolt argued with appellant and moved out. The day appellant was arrested, Bolt was also picked up and taken to the police station where she gave a statement. She also took the police to the Sessions Motel where they recovered the victim's suitcase.

Rolando Gonzales Rubio testified that on Sunday, August 12, 1979, he was living at 2216 Smith. He arrived home shortly after 1:30 a.m., Monday morning. Rubio testified that after entering his home and hearing two gunshots, he looked out a window and saw a black man running to a taxi cab. Rubio testified that this man got into the cab and drove the cab into the street where it stopped and a second black man got into the front passenger side of the cab. Rubio could not identify the two men nor did he ever see a gun. He did see a man lying on the ground.

James Lewis testified that he and Viola Wiley were driving around in his cab during the evening of August 12, 1979, when they picked up appellant and Gardner at approximately 10 p.m. Appellant asked him to drive them to the corner of Jackson and Wichita. When they reached the corner of Hadley and Smith, appellant asked Lewis to let him out of the cab. Lewis stopped the car and both appellant and Gardner exited the cab. Lewis then pulled into a parking lot beside a building and parked the car. He and Wiley were engaged in amorous conversation when appellant returned to the car and jumped in. Appellant began complaining that someone had sprayed something in his face. He also was complaining that Gardner had not helped him. Lewis started the car and began pulling out of the driveway when he saw Gardner standing across the street. Lewis pulled over to the opposite side of the street and picked up Gardner. When Gardner entered the cab, appellant stated "I shot him in the back of the head and he fell on his face". Lewis testified that as he was driving, he glanced into the back seat and saw appellant holding a small gun. Appellant requested that Lewis drive them to the Greyhound depot. Appellant and Gardner went into the depot and came out empty-handed. They asked Lewis to take him to the Continental Trailways depot. Both men went into the depot and when they returned appellant was carrying a beige suitcase. Lewis then dropped Gardner off at the Act II motel and took appellant to a motel on Alameda. Before he got out of the cab, appellant placed a $10.00 bill and four or five $50.00 traveler's checks on the front seat of the cab.

Murray Gardner testified that around 9 p.m. on August 12, 1979, he and appellant got into Lewis's cab and rode around for a while. As they were driving along Hadley Street, they saw a man walking ahead of the cab. Appellant told Lewis to slow down and drive past the man. Lewis drove by the man and circled the block. Appellant and Gardner exited the cab and Lewis drove it behind a building. Gardner testified that he knew as soon as they got out of the cab that they were going to rob the man. Appellant and Gardner jogged up to the man and when they were within six feet of him, the man turned around. At that point appellant pulled a gun and pointed it at the man. The man tried to run away and appellant shot him in the back of the head. After the man fell to the ground, appellant went through his pockets, tearing the chest pocket off the man's shirt in the process. Appellant removed a billfold and another wallet-type container. He also removed from the man's pockets, the man's insurance card, identification and social security card. The appellant then ran off and jumped into the cab. Gardner, who was stunned by the fact that appellant had actually shot the man, stood there for a minute. By this time, the cab was pulling out of the parking lot. It pulled up beside him and he jumped into the back seat. Gardner testified that appellant was already counting the money—$500.00 in cash plus the traveler's checks. Appellant had also found a key in the man's pocket. Lewis drove appellant and Gardner to the Greyhound depot and then the Continental Trailways depot. Gardner testified that he stayed in the car when appellant went inside the Trailways depot. When the appel-

lant returned, he was carrying the beige suitcase. Gardner testified that after this, the group went to the Eastex Cafe where they bought some drugs. Then they all went to appellant's room at the Pioneer Motel where appellant, Gardner and Viola Wiley all injected drugs. The group also split up the money from the robbery three ways. They all stayed there for approximately two hours and then they dropped Gardner off at the Act II motel.

Connie Wilson testified that on Monday afternoon, August 13, appellant came to her apartment and asked to use her ID. He showed her the traveler's checks and told her that he had shot a man twice in the head and robbed him. Wilson refused to give appellant the ID but she saw him later in the day and he told her he had cashed a couple of the checks.

Officer James Bullard testified that he arrested appellant on August 23, 1979, after a disturbance at Annie's Restaurant, a gathering place for prostitutes and their pimps. In the booth where appellant was sitting, Bullard found a .22 RG black steel revolver with a brown handle. Bullard submitted the gun to the lab for ballistics tests.

C.E. Anderson, a firearms examiner for the Houston Police Department, testified that he examined the gun found by Bullard and determined it was a Rhome RG .22 caliber pistol. After running tests on the gun and on a .22 caliber bullet removed from the victim, Anderson could not say positively that the bullet was fired from the gun but he was positive the bullet was fired from a gun manufactured by Rhome.

Medical testimony established that the victim died as a result of two gunshot wounds to his back and head. Other testimony showed that the victim had purchased twenty $50 American Express traveler's checks on July 17, 1979. Appellant had signed his name on the top of each check. Many of these checks were passed after the victim had died, including one to the Holiday Inn Central in Houston. Several of the checks were endorsed by James Lewis. Other evidence showed that Charles Machacek registered for a room at the Tidelands Motor Inn on August 13, at the Ramada Inn on August 14, and at the Thunderbird Motel on August 15. A.D. Queen, an examiner of questioned documents for the City of Houston, testified that appellant had signed the victim's name to the traveler's checks and to the room registration cards.

■ In his sixth ground of error, appellant claims that the trial court erred in refusing to submit to the jury an instruction allowing them to determine whether Viola Wiley was an accomplice witness as a matter of fact. An accomplice witness is someone who participated with another before, during or after the commission of a crime; one is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Harris v. State*, 645 S.W.2d 447, 456 (Tex.Cr.App. 1983); *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978). Mere presence at the scene of the offense does not compel the conclusion that the witness is an accomplice witness. *Arney v. State*, 580 S.W.2d 836, 839 (Tex.Cr.App.1979); *Easter v. State*, 536 S.W.2d 223 (Tex.Cr.App.1976).

In *Harris v. State,* supra, we wrote the following:

"When it is clear from the evidence that the witness was *not* an accomplice, no charge need be given to the jury either that a witness is an accomplice as a matter of law or that the jury is to decide whether the witness is an accomplice. *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1979). (Deaf mute woman present in car outside convenience store could not have heard shots, and record did not reflect when she knew of robbery.) *Silba v. State*, 161 Tex.Cr.R. 135, 275 S.W.2d 108 (1954). (Sixteen year old took no part in attack but left scene with attackers, was arrested and detained in juvenile home.) However, if there is a *conflict in the evidence* the court should charge the jury on the question of wheth-

er the witness was an accomplice *as a matter of fact. Singletary v. State,* 509 S.W.2d 572 (Tex.Cr.App.1974); *Dears v. State,* 506 S.W.2d 606 (Tex.Cr.App.1974); *Silba v. State,* supra. See especially *Drummond v. State,* 624 S.W.2d 690 (Tex.App.—Beaumont 1981), with facts strikingly similar to the instant case." 645 S.W.2d at 456. [Emphasis in original.]

■ In the instant case, there was no conflicting testimony as to Wiley's part in the murder. The record shows that Wiley had no idea that a murder was to take place, nor did she even realize that a murder had occurred when appellant and Gardner reentered the cab after shooting and robbing the victim. Appellant argues that since Gardner testified that Wiley saw the men split up the money taken from the victim and that she partook of narcotics purchased with some of the money, the jury should have been allowed to determine whether she was an accomplice as a matter of fact. This Court has stated on several occasions that the fact that a witness has complicity with an accused in the commission of other offenses does not make his testimony that of an accomplice witness for the offense for which the accused is on trial if there is no showing of the witness's complicity in that offense. *Caraway v. State,* 550 S.W.2d 699 (Tex.Cr.App.1977); *Ballard v. State,* 519 S.W.2d 426 (Tex.Cr.App.1975). We find no evidence in the instant case to show Wiley's complicity in the capital murder of Charles Machacek. The trial court properly refused the appellant's requested instruction. Appellant's sixth ground of error is overruled.

In grounds of error two through five, appellant contends first, that the evidence is insufficient to show he committed the offense and second, that the accomplice witness testimony was not sufficiently corroborated. We will discuss these grounds together.

The court's charge explained the law as to the testimony of accomplice witnesses.

The court then instructed the jury that Lewis and Gardner were accomplice witnesses and that the appellant could not be convicted on their testimony alone. Rather, there had to be other evidence which tended to connect the appellant with the commission of the offense before they could vote to convict appellant. Clearly, the testimony of Lewis and Gardner implicated appellant in the commission of the offense. Thus, the remaining question is whether the evidence is sufficient to corroborate the accomplice witness testimony.

■ Article 38.14, V.A.C.C.P., requires that before a conviction can be obtained based upon the testimony of an accomplice witness, there must be some corroborating testimony that tends to connect the defendant with the offense. To test the sufficiency of this corroborating testimony, the reviewing court must eliminate from consideration the evidence of the accomplice witness, and then examine the evidence of the other witnesses to ascertain if it is of an incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient. *Paulus v. State,* 633 S.W.2d 827 (Tex.Cr.App.1982) (on rehearing); *Walker v. State,* 615 S.W.2d 728 (Tex.Cr.App.1981); *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr.App.1979). The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. *Walker v. State,* supra; *Eckert v. State,* 623 S.W.2d 359 (Tex.Cr.App.1981); *Carrillo v. State,* supra; *Reynolds v. State,* supra.

■ Our review of the record shows that there is an abundance of corroborating evidence. The testimony of Viola Wiley placed appellant at the scene of the murder with Gardner. She testified that she heard two gunshots and then saw appellant running back toward the cab. Rolando Rubio testified that after hearing gunshots he looked out his window and saw the victim lying on the ground and two black men

getting away in a cab. Not only did Sharon Bolt see appellant in possession of the victim's suitcase and traveler's checks, but the appellant admitted to her that he had killed and robbed the victim. Appellant also told Connie Wilson that he had killed and robbed the victim. Appellant was found in possession of a Rhome .22 caliber pistol. Medical and ballistics evidence established that the victim was killed by a Rhome .22 caliber gun. We find this evidence clearly corroborates the testimony of the accomplice witnesses. These grounds of error are overruled.

The judgment is affirmed.

TEAGUE, J., dissents to the disposition that is made of the first ground of error.