Lynn Murphy CREEL, Appellant,

v.

The STATE of Texas, Appellee.

No. 701–86.

Court of Criminal Appeals of Texas,
En Banc.

May 18, 1988.

David R. Weiner, San Antonio, Lynn M. Creel, pro se, for appellant.

Sam D. Millsap, Jr., Former Dist. Atty., Fred G. Rodriguez, Dist. Atty. and Edward F. Shaughnessy, III, Asst. Dist. Atty., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Appellant was convicted of the offense of capital murder and assessed a life sentence. V.T.C.A., Penal Code, § 19.03(a)(2). In his petition for discretionary review, he contends that the Speedy Trial Act [1] is constitutional, the trial court erred by failing to give the requested instruction on felony murder, and the trial court erred in denying appellant's jury instruction as to the factual issue whether Irene Plangman was an accomplice witness. The Court of Appeals for the Fourth Supreme Judicial District affirmed the conviction holding that the Speedy Trial Act is unconstitutional. Furthermore, the appeals court held appellant failed to meet his burden of proof for an instruction on felony murder as the record reflected only evidence of an intentional killing, and the trial court did not err in refusing to charge the jury on Plangman's complicity as an accomplice witness as the evidence adduced at trial failed to show Plangman participated with appellant to any extent making her amenable to pros-

ecution as a party. *Creel v. State,* 710 S.W.2d 120 (Tex.App.—San Antonio 1986). We will affirm.

The record reflects [2] that appellant met Irene Plangman in July of 1980, and shortly thereafter they became intimate. Their relationship was depicted as stormy. Prior to their involvement, Plangman became acquainted with Joan Smith, the wife of the deceased. As a result of a business transaction, Plangman befriended Joan Smith, and eventually lived a short time with the Smith family.

Months later, appellant expressed a desire to sell three pieces of gold jewelry. Plangman, who was in the business of resale, agreed to sell the items for him. Joan Smith was immediately interested in purchasing the jewelry; however, she was only able to raise $500 of the $1400 purchase price. Appellant became disenchanted by the failure of the Smiths to pay the balance. As time passed, he became more angry and resentful over the sale of the jewelry and Plangman's close friendship with Mrs. Smith. In September of 1981, a month prior to the offense, the Smiths placed their lake property in Medina County on the market. In October, Mrs. Smith informed Plangman of the proposed sale and requested she remove her antique furniture from storage on the property. As a result of this conversation, Plangman took appellant to the house at Medina Lake and removed her belongings.

On the evening of October 20, 1981, Joan Smith received a telephone call from an unidentified female person inquiring about the lake property. Mr. Smith handled the call. At trial, Julie Woodley testified that appellant contacted her on October 20, 1981. He requested she make a telephone call as a potential buyer for the land and set up a meeting with the owners. According to Woodley, appellant wished to talk to the owners about money which he was owed. Following appellant's instructions, Woodley arranged a meeting with Mr. Smith for 10:00 a.m. the next day. Appel-

---

1. Tex.Code Crim.Pro.Ann., Art. 32A.02 (Vernon Supp.1986).

2. We will adopt much of the facts from the Court of Appeals' opinion and appellant's brief.

lant contacted Woodley to ascertain the meeting was arranged.

Mrs. Smith testified that her husband left home on October 21, 1981, at 9:26 a.m. to meet the interested party. At that time, Mr. Smith had in his possession a diamond ring with the initials "WJS", a diamond cluster ring with a stone encircled by six other diamonds, a gold Seiko watch and a solid gold pen and pencil set.

Appellant called Plangman the afternoon of October 21, 1981, and wanted to visit with her. When appellant later arrived at her home, he told her Wilson Smith was in his van. He then asked for her assistance. Plangman claimed disbelief because of appellant's prior boasts of a similar nature. Nevertheless, she refused to help him. He then declared "he would handle things himself." Concerned appellant might be telling the truth, Plangman suggested he release Smith. In a rage, appellant exclaimed, "I am not going to spend the rest of [my] life in jail for kidnapping someone and then talking about it later." At that point, Plangman felt Smith was alive.

Later that afternoon, appellant called Plangman and told her Smith was in a storage unit. Appellant related Smith "got loose," beat on the door, and yelled for help. Appellant further related Smith managed to free himself while in the back of the van and then tried to escape. Very early the next morning, appellant called Plangman. In reference to Smith he told her, "Well it's all over. It's finished", and "Don't feel sorry for him. He was a bastard to the end." According to Plangman, appellant told her he waited for Smith at "the house" and took a curtain to put around Smith's shoulders. Appellant put Smith in his (Smith's) station wagon and drove to a wooded area behind the house to transfer Smith to his van. Plangman testified that appellant commented about Smith, "what happened to a person as they got older, did they just give up a fight to live, or did they just not care, or did they just become hard and—refused to fight for life."

Plangman called Joan Smith and inquired about her husband. Mrs. Smith, according to Plangman, did not appear concerned about him. Thus, Plangman disbelieved appellant's tale about Mr. Smith.

On October 23, 1981, appellant called Plangman. During this conversation, he told Plangman that she caused him to be so paranoid he returned to the scene of the crime and injured his leg while crawling through heavy brush. He told Plangman "everything was as he had left it." On November 24, 1981, appellant was arrested for outstanding traffic violations. Thereafter, he was transferred to Medina County and jailed on charges of robbery and kidnapping.

A few days before the arrest, Plangman and her mother borrowed appellant's van for an errand. In the side pocket on the door, Plangman found a white envelope containing a man's watch, a ring, and a pen and pencil set. She recognized the ring, a man's initial diamond ring, as the one she had seen many times on Wilson Smith. Plangman showed appellant and he explained it was not his intention she find the items as he planned to sell them.

Al Cuellar, a Texas Ranger, became involved in the investigation of Smith's disappearance. Mrs. Smith gave Cuellar the names of Plangman and appellant as possible suspects. On November 18, 1981, Cuellar interviewed Plangman at the Castle Hills Police Department. She provided Cuellar with initial information into the disappearance, and eventually became Cuellar's chief source of information. Thereafter, both maintained continuous contact with each other through January of 1982. As a result of the information supplied by Plangman, appellant became a prime suspect in the case. Indeed much, if not most, of the evidence marshalled against appellant was obtained either directly or indirectly from Plangman.

Plangman related to Cuellar appellant's boast he had marched Smith out of the lake house with a curtain draped around his shoulders. In the course of his investigation, Cuellar found a curtain inside Smith's station wagon. This indicated to Cuellar that only the killer, or one to whom the

killer confided the facts of the killing, could have known about the curtain.

At trial, Charles Goodnough testified appellant sold him a ring on October 26, 1981. Goodnough described the ring as a man's white gold ring with six stones clustered around a single center stone. He identified a ring in a catalog as similar to the one he purchased from appellant. Mrs. Smith identified the same ring as resembling the one that belonged to her husband at the time of his disappearance.

Randal Graham and wife visited appellant a month before his arrest. Graham described appellant as "real schizophrenic" and in a hurry to leave his house. Appellant told Graham he thought he was being "watched by the FBI." When asked why he thought he was being watched, appellant told Graham, "I've killed a man and I've got his body in the back of a van, and I need you to help me get rid of it." Both Graham and his spouse declined to help appellant and immediately left. Graham's wife corroborated her husband's testimony regarding the conversation.

On December 11, 1981, while appellant remained jailed, Cuellar obtained Plangman's permission to search appellant's van, as it was parked at Plangman's house. At the time of the search, Plangman had a general power of attorney from appellant. The search yielded brittle rope fibers similar to those found in Smith's station wagon, as well as a rope hanging in the barn at the Smith's lake house.

There were extensive communications with appellant during the time of his incarceration from November 24, 1981, through February 17, 1982. The majority of these communications were in the form of letters written by appellant to Plangman. She gave some of these letters to appellant's former attorney, and the remaining were given to the State's attorney. After appellant was incarcerated he began to ask Plangman to change her name to Creel so they would appear married, thus preventing her from testifying against him. Near December 6, 1981, appellant informed Plangman it was extremely important to establish a marital relationship.

Plangman testified the letters were written in code to convey instructions on disposing of Smith's body. She explained the term "fence posts" referred to the body. According to Plangman's interpretation of appellant's letters, David Wolf was to destroy the body by chemicals. Appellant directed Plangman to relay information to Wolf about purchasing the acids and pouring them over the body. In a letter dated December 10, 1981, appellant advised Plangman not to undertake the job of dissolving the body, but to give the instructions to her "brother" (Wolf).

One letter instructed Wolf to contact Woodley. Appellant wanted Wolf to advise Woodley not to make a statement. According to the instructions, Wolf would wait to contact Woodley until the "fence post job is successfully completed," which meant after the body was dissolved. In letters dated December 21, 1981, December 23, 1981, and January 4, 1982, appellant again referred to Wolf disposing of the body. He urged Plangman to have Wolf talk to Woodley. Further references to marriage were made in these letters. At the same time, appellant urged Plangman to obtain false backdated receipts for auto parts so he could explain the presence of his fingerprints in Smith's station wagon. Although the record does not disclose what efforts were made, Plangman was never able to obtain such receipts.

After appellant learned of the search of his van, he communicated to Plangman to have the power of attorney declared void. Appellant further instructed her to inform his attorney she did not consent to the search of his van.

David Wolf, testifying as a State's witness, stated Plangman contacted him after appellant's arrest. She gave him a map from the appellant. After looking at the map, Wolf disposed of it. A week later, a second map was sent to him, which he again read and discarded. The map depicted two roads, IH–10, and two buildings, the northern one having an "X" marked on it.

Plangman brought Wolf a letter from appellant discussing the dissolving of "fence posts," which he understood to

mean a body. The letter referred to pouring a mixture of acids over a body. According to Wolf, Plangman asked him at least eight times to go to the location and dispose of the body. Plangman finally quit asking when Wolf falsified a story of having gone to the location and being stopped by a policeman for trespassing.

Jay Martinez, a cellmate of appellant during the months of November and December, testified about conversations concerning the disposing of bodies. Martinez had a degree in chemistry. Appellant became interested in the method the Mafia chose to dispose of bodies. Martinez explained a method involving a combination of nitric and sulfuric acid called aqua regia, and acidic acid. According to Martinez, this information was discussed in the theoretical context of disposing of a carcass of an animal. Appellant persisted in asking the combination of acid to form the aqua regia solution.

On January 5, 1982, the Medina County Grand Jury returned indictments for the offenses of aggravated robbery and aggravated kidnapping committed on Wilson James Smith on October 21, 1981.

Ranger Cuellar repeatedly asked Plangman the location of Smith's body. She emphatically denied any knowledge. On January 6, 1982, Cuellar called Plangman and arranged a meeting with her. At this meeting, Cuellar questioned Plangman about the location of the body. Plangman finally said, "Just head this way, just take off," or "Let's just drive." At Plangman's directions, Cueller drove until she instructed him to stop. They appeared to be at a rural, abandoned residence. Plangman suggested the possibility the body was in one of the barns. However, Plangman insisted she did not know where the body was buried. She led Cuellar to that location because the appellant had formerly brought her there.

The following day, Cuellar went to the property. After entering one of the barns and poking around for a few minutes, Cuellar raised a piece of plywood and smelled a strong odor of a decomposed human. Later that day, Cuellar returned to the scene accompanied by a "crime lab" team. Plangman rushed to the location to find Cuellar. She arrived before the digging began. Upon hearing the body had been found, she spontaneously exclaimed, "I did it." Plangman explained her statement at the scene was caused by the emotional stress and shock associated with finding the body. She repeatedly denied any participation in the killing, the burying of the body, or the location of the burying.

On January 7, 1982, Plangman received a letter from appellant which stated, "I can't believe this is happening. I saw they found the body." On January 29, 1982, appellant wrote of the need to "point conclusively to Jo Ann Smith...." Appellant again mentioned obtaining false receipts for automobile parts. Letters dated January 26, 1982, and February 2, 1982, expressed an interest in Woodley and Wolf. In regard to Woodley, appellant wrote, "I would rather for her not to testify if possible."

In subsequent letters appellant emphasized the import of Plangman changing her driver's license to his name in order to keep "them" from taking possession of his van. Appellant warned her, "Do not go in the van for any reasons." Appellant's letters of February 6th and 8th inquired whether Wolf visited the location depicted on the map. Once again, in a letter dated February 14th, appellant requested the power of attorney be declared illegal, and that Woodley not testify.

On February 17th, Plangman and appellant married by proxy as appellant was incarcerated. According to Plangman, appellant married her for love and to prevent her from testifying against him. Plangman married only to "save appellant's neck." Appellant was released from jail in March. By November, Plangman filed for divorce. The divorce was granted January 28, 1983, and the decree was signed February 15, 1983.

On March 3, 1983, Plangman encountered appellant at a convenience store in San Antonio. Appellant pushed her into his van and verbally abused her. In Plangman's words, appellant was "driving wildly

down the street" while saying, "Now is the time. I've reached that decision. There's no other way. I want you to understand, I have to kill you. I cannot take the chance of you testifying against me." Appellant then pleaded and demanded they remarry.

Dr. Vincent DiMaio, the chief medical examiner for Bexar County, testified about the autopsy of Wilson Smith. He related the body was a severely decomposed, partially skeletonized adult male. The body was encrusted in sixty-eight pounds of dirt and pebbles. Running across the lower part of the partially skeletonized face and covering the mouth was a silver-colored duct tape. The nose area was not covered by the tape,[3] and the nose and ears appeared eaten away. Upon removal of the tape from the mouth, a piece of knotted red cloth was wedged in the mouth. However, the autopsy did not reveal any evidence of trauma such as fractures or bullet holes. The hands of the deceased were taped together in front of the body with silver-gray duct tape. The feet were tied together by two loops of a white tan cloth. A forty-three inch length of white tan cord was draped across the anterior upper and lower legs and across the lower abdomen. He observed the deceased suffered from moderate coronary artery disease.

DiMaio testified the body was in a state of decomposition consistent with one in the ground from October 22, 1981, until January 6, 1982. He expressed the opinion the death was "homicide," as the person was bound, the mouth stuffed with a gag, and the hands and feet tied and bound. Due to the extreme state of the body's decomposition, the exact cause of death could not be ascertained. The gag stuffed in the mouth of the deceased was more dangerous than the tape wrapped around his head. A gag works to block the airway; thus, it prevents his breathing and ultimately causes death by choking. DiMaio was unable to state Smith choked on the gag.

Smith was identified through comparison of dentures by Dr. James Catone and Dr. Dennis Miller. In 1973, Dr. Miller made a set of upper and lower plates for Smith. He positively identified the dentures and the jaw bones of Smith. The x-rays of Smith's teeth in 1973 and x-rays made by Catone of the deceased's teeth were positive. Dr. Catone determined the dentures and the jaw bones belonged to Smith.

■ In appellant's first ground for review, he contends the Court of Appeals erred in holding the Speedy Trial Act unconstitutional. Our holding in *Meshell v. State*, 739 S.W.2d 246 (Tex.Cr.App., 1987) renders appellant's complaint regarding the constitutionality of the Speedy Trial Act moot. Parenthetically, we would add the State advanced the position that the Speedy Trial Act is unconstitutional in the trial court and the Court of Appeals. Accordingly, appellant's first ground for review is overruled.

■ We now address appellant's claim that the court erred by failing to submit a jury charge instruction on the lesser included offense of felony murder. Merely because a lesser offense is included within the proof of a greater offense does not always warrant a jury charge on the lesser offense. *Lincecum v. State*, 736 S.W.2d 673 (Tex.Cr.App.1987). In *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr.App.1985), we adopted the two-prong test set forth in *Royster v. State*, 622 S.W.2d 442 (Tex.Cr. App.1981) for determining whether a jury must be charged on a lesser included offense. First, the lesser included offense must be included within the proof necessary to establish the charged offense. Second, there must be evidence in the record that if the defendant is guilty, he is guilty only of the lesser offense. *Aguilar*, supra, at 558; *Lincecum*, supra; *Rogers v. State*, 687 S.W.2d 337 (Tex.Cr.App.1985); *Lugo v. State*, 667 S.W.2d 144 (Tex.Cr.App.1984); *Royster*, supra.

To establish the first prong of the test, we turn to the definition of a lesser includ-

---

**3.** DiMaio believed that the ragged appearance of the tape around the nose was consistent with a rodent having chewed away on the tape while eating the nose. He nevertheless conceded that it was possible that whoever put the tape around the head of the deceased might have deliberately left the nose exposed so that he could breathe through it.

ed offense as set forth in the Code of Criminal Procedure. Art. 37.09, V.A.C.C.P. provides:

An offense is a lesser included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

[Acts 1965, 59th Leg., p. 317, ch. 722 § 1, eff. Jan. 1, 1966. Amended by Acts 1973, 63rd Leg., p. 972, ch. 399 § 2(a), eff. Jan. 11, 1974.]

 Felony murder is a lesser included offense of capital murder since it meets the requirements of Art. 37.09(1) above. Therefore, the first prong of the *Aguilar* test is established. The question remains whether there is evidence that appellant, if guilty, is only guilty of the lesser included offense of felony murder. The elements of felony murder are set out in V.T.C.A., Penal Code, § 19.02(a)(3). As applied to this case, they are:

(1) a person,

(2) committing or attempting to commit kidnapping and robbery,

(3) who in the course of and in furtherance of the commission or attempt,

(4) commits or attempts to commit an act clearly dangerous to human life,

(5) that causes the death of an individual.

In the instant case, felony murder is a lesser included offense of the charged capital murder. The culpable mental state is the only difference in the two offenses. Capital murder requires an intentional cause of death, whereas felony murder requires an intent to commit only the underlying offense of robbery and kidnapping.

*Garrett v. State,* 573 S.W.2d 543 (Tex.Cr. App.1978); *Rodriguez v. State,* 548 S.W.2d 26 (Tex.Cr.App.1977); *Lamb v. State,* 680 S.W.2d 11 (Tex.Cr.App.1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985).

The crucial question which we must resolve is whether the evidence showed the appellant only intended to rob or kidnap Wilson James Smith and did not intend to kill him. Initially, we note that appellant did not testify nor offer any defensive evidence or testimony which might reasonably have raised an inference that he was guilty only of felony murder. The only evidence conceivably favorable to appellant exists as a result of cross examination of state witnesses. The appellant contends the testimony of Dr. DiMaio amounts to some evidence he only intended to commit a felony. In regard to the cause of death, Dr. DiMaio testified to the following:

A The manner of death was homicide. The exact way the death came about, we could not say, due to the fact that the body was decomposed.

Q ... but what made you conclude that it was a homicide?

A Due to the fact that the person was bound, gagged, the mouth covered with a tape, a gag stuffed in the mouth, hands tied behind—tied in front, bound in front with tape, feet tied together and the body is buried in a—in the grave.... (R. IX—2570)

\* \* \* \* \* \*

Q And in this case, were the ears attacked?

A There were no ears.

Q Okay. They were gone?

A Yes, sir.

Q There was no chewing to indicate that anything had chewed it on the tape at the ear level?

A No, sir. Well, there was no tape at the ear level. The tape is below the ears.

Q Okay. So, at any rate, the ears were gone?

A That's correct.

Q And the way that you have constructed the—the tape on the mannequin head, is it just as consistent with animals having chewed this away as to whoever put it on there might have wanted to leave the nose exposed?

A Yes, sir.

Q So, it could have been that whoever put the tape around him wanted the person to be able to breath (sic) through his nose?

A Yes, sir. (R. IX—2601)

* * * * * *

Q The location of the tape on the body could a person be taped up in this fashion and could he breathe?

A Through the nose, yes, sir.

Q Okay. I mean, could he sustain life in that fashion?

A Yes, sir, through the nose, as long as the—the dangerous thing, really, is not the tape—

Q Yes, sir.

A —it's the gag that's put in the mouth. That's what kills most people. It's not the covering of the—the mouth.

Q The gag in his—in his mouth that you found was more dangerous to him than tape around him; is that correct?

A Yes, sir. Because what happens is, is these gags— ... people die when they're—when they're, you know, tied up like this. ... if somebody' (sic) wedged a gag in the mouth and it's worked its way back, it occludes the airway in the back. And then, you can have your mouth and nose completely exposed to the air, but it can't go back because the airway is blocked in the back, with the gag.

* * * * * *

Q And in the course of trying to make them quiet, what happens?

A The gag works its way back and they choke to death. (R. IX—2605-2606)

We have reviewed Dr. DiMaio's entire testimony and hold it fails to raise the issue of lack of intent to kill. His testimony provides nothing regarding an intent on the appellant to commit only a robbery or kidnapping. The medical examiner merely testified to the possibility the deceased could have died of heart failure, but most definitely felt the cause of death was the blocked airway due to the gag stuffed in complainant's mouth. Moreover, he did not testify that any other aggravating circumstances other than the gag actually did cause the death of the complainant. Therefore, we conclude there was no evidence to raise the lesser included offense.

Furthermore, the appellant's intent to kill the complainant is further reflected in Irene Plangman's testimony:

Q What did he say to you, ma'am?

A He said that—

Q Now, what I want you to do is use his words, if you can.

A I'll try. It's been a long time. He said that he had Bill Smith in—in the van.

Q In what van?

A His van.

* * * * * *

Q Did he suggest to you anything he was going to do with Bill Smith at that point?

A No. (R. X—2982)

* * * * * *

Q When he said that, what did you say to him?

A Well, I told him no, of course, but to me it was another one of Lynn's scare tactics that he used to terrify me and—more or less that he called it in the past—to kind of keep me in line.

Q Was this something new that—as far as his telling you things of this—of this same kind?

A No, it wasn't. It happened many times.

Q What, if anything, did you say about your daughter?

A I said Michelle was very sick.... (R. X—2983)

Q What did the defendant say at that point?

A Said okay, he would handle things himself.

Q Did he ask you your opinion about the matter, what you thought he should do?

A No. But I expressed to him what I thought.

Q What did you think?

A That if what he said was true, then he ought, for God's sake, to let him go.

Q What did the defendant say?

A He became enraged. He said, *no, that he wasn't going to spend the rest of his life in jail for kidnapping someone and then [have the victim] talking about it later.* (R.—X—2984).

As we stated earlier, in order to merit a charge on a lesser included offense, the defendant must show that the lesser included offense is established within the proof necessary to establish the charged offense, and there must be evidence that the defendant, if guilty, is guilty only of the lesser included offense. As the appellant did not testify, nor offer any testimony which might reasonably raise any lesser included offense, and there is no evidence otherwise raising the issue, a charge on the lesser included offense of felony murder is not required. See *Denison v. State*, 651 S.W.2d 754 (Tex.Cr.App.1983); *Thomas v. State*, 543 S.W.2d 645 (Tex.Cr.App.1976); *Lincecum*, supra; *Aguilar*, supra; *Rogers*, supra, *Lugo*, supra; *Royster*, supra.

We find the evidence demonstrates not only the intent to commit robbery and kidnapping, but also the intent to kill. Thus, we find the trial court did not err in refusing to instruct the jury on the lesser included offense, as the evidence did not raise the issue of felony murder. Accordingly, appellant's second ground for review is overruled.

 In his final ground for review, appellant maintains the Court of Appeals erroneously upheld the trial court's denial of a jury instruction on the issue whether Irene Plangman was an accomplice as a matter of fact. An accomplice witness is an individual who participated with the accused before, during, or after commission of the crime for which he is on trial. *Brooks v. State*, 686 S.W.2d 952 (Tex.Cr. App.1985); *Ferguson v. State*, 573 S.W.2d

516 (Tex.Cr.App.1978), cert. denied 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304 (1979). One is not an "accomplice witness" who cannot be prosecuted for the offense for which the accused is charged. *Russell v. State*, 598 S.W.2d 238 (Tex.Cr.App.1980), cert. denied 449 U.S. 1003, 101 S.Ct. 544, 66 L.Ed.2d 300 (1980); *Singletary v. State*, 509 S.W.2d 572 (Tex.Cr.App.1974). In addition, "mere presence" at the scene of the offense is not a sufficient amount of participation by the witness to render her an "accomplice witness." *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); cert denied 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *Arney v. State*, 580 S.W.2d 836 (Tex.Cr.App.1979). Moreover, a witness is not deemed an accomplice witness because she failed to disclose the commission of the offense to law enforcement officials. *Easter v. State*, 536 S.W.2d 223 (Tex.Cr.App. 1976); *Caraway v. State*, 550 S.W.2d 699 (Tex.Cr.App.1977); *Kerns v. State*, 550 S.W.2d 91 (Tex.Cr.App.1977); *Marlo v. State*, 720 S.W.2d 496 (Tex.Cr.App.1986). Furthermore, a witness is not proved an accomplice by proof merely that she interested herself in the defense of the accused. Finally, a witness' complicity with the accused in the commission of another offense does not make her testimony that of an accomplice for which the accused is on trial. *Caraway v. State*, supra; *Easter v. State*, supra; *Carnathan v. State*, 478 S.W.2d 490 (Tex.Cr.App.1972), cert. denied, 409 U.S. 866, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972).

 The appellant contends Plangman's statement, "I did it" at the time the body was unearthed is sufficient evidence to mandate an accomplice witness instruction. Her statement was never seriously considered by the investigating officer, although as a matter of formality at the time of her utterance, Officer Cuellar "hesitantly" read her the *Miranda* warnings. She regained her composure and adamantly denied *any* participation in the crime. She explained her statement "I did it" as an emotional reference to her leading the officers to the location of the body. At trial, she admitted, "I must be the craziest wom-

an in town." The sum of the evidence adduced concerning Plangman's participation shows only that she knew of the crime after its commission. We recently reaffirmed the holding that one is not an accomplice witness either because one knew of the offense and did not disclose it or because of one's presence at the scene of the crime. *Kunkle v. State* (Tex.Cr.App. No., 69,501, delivered June 18, 1986). Furthermore, without an affirmative act, one "cannot be an accomplice witness, even as a matter of fact." Id., slip opinion at 9. The record in the instant case does not reflect any affirmative act on Plangman's part to assist in or encourage the murder. See *Kunkle*, supra; *Caraway*, supra; *Chappell v. State*, 519 S.W.2d 453 (Tex.Cr.App.1978). Appellant made no showing of Plangman participating in planning or promoting the offense. Nor did appellant prove Plangman had any knowledge of the murder soon to transpire. See *Cross v. State*, 550 S.W.2d 61 (Tex.Cr.App.1977). Thus, Plangman is not an accomplice to capital murder, as she did not perform any affirmative act in its commission. As we previously stated, Plangman's mere knowledge and failure to disclose does not compel the conclusion that she was an accomplice. *Easter*, supra; *Caraway*, supra; *Kerns*, supra. Viewing the evidence collectively, the facts are insufficient to require an instruction in the charge whether Irene Plangman was an accomplice witness. Therefore, we hold the trial court did not err in refusing to so instruct the jury. Appellant's third ground for review is overruled.

Therefore, given the foregoing reasons, the judgment of the Court of Appeals is affirmed.

CLINTON, CAMPBELL and DUNCAN, JJ., concur in the result.

TEAGUE, J., dissents.

WHITE, J., not participating.