**Opinion issued August 26, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00141-CR

———————————

**ROXMAN CHRISTIAN CASTRO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 1214826**

---

## MEMORANDUM OPINION

A jury found appellant, Roxman Christian Castro, guilty of the offense of

capital murder[1] and assessed his punishment at confinement for life. In two issues,

appellant contends that the trial court erred in not instructing the jury on the lesser-

---

[1]     *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2013).

included offense of felony murder and limiting his argument regarding "the inherent weakness of eyewitness identification testimony."

We affirm.

## Background

Enrique Dominguez testified that on April 6, 2009, he and the complainant, Edgar Menjivar, a close friend, went to a bar to play pool and drink beer. At the bar, a man asked them if they wanted to meet with two prostitutes for a "low price." Dominguez and the complainant agreed and, in their separate vehicles, followed the man to "a cantina," where two women—one of whom said her name was "Jackie"—were waiting. Dominguez, the complainant, and the two women then drove to an apartment, where Dominguez was surprised to see the man who had set up the meeting with the prostitutes. Once inside a bedroom, Jackie told Dominguez that she wanted more money; she left the room when he said that he did not have any more.

Immediately thereafter, three men came into the bedroom, began to beat Dominguez with "weapons," and threw him onto the floor. The assailants then brought the complainant, who had been beaten in another room, to Dominguez, tied the two men up, and pushed their heads under the bed. The assailants asked Dominguez and the complainant repeatedly about a man known as "Grenas," who owned an auto body shop and was a "coyote," i.e., one who smuggles

2

undocumented immigrants from Mexico into the United States for money. Dominguez explained to the jury that he knew Grenas through the complainant, and they had twice "h[u]ng out" together at Grenas's shop. At first, Dominguez denied knowing Grenas, but the assailants continued to beat him and the complainant. Dominguez finally admitted to knowing Grenas after the assailants found a picture of Dominguez's family and threatened to kill them. Dominguez and the complainant remained in the bedroom into the next day.

The assailants forced Dominguez, from his cellular telephone, to call Grenas and ask if he could see him at his shop. Three of the assailants took Dominguez so that he could show them the location of Grenas's shop, and they then returned to the apartment. Dominguez explained that more than seven individuals were involved in his kidnapping and a plan to "steal" undocumented immigrants from Grenas.

Dominguez heard the assailants refer to one man as "El Gato." The assailants generally kept their faces partially concealed with the hoods of their sweatshirts. Appellant, however, showed Dominguez his face and pointed a rifle to Dominguez's forehead, stating that, if everything went well at Grenas's shop, they would allow Dominguez and the complainant to run; but, if anything went wrong, he told Dominguez "to take a good look at [appellant's] face because that was the last time we were going to see him because we were going to get killed."

3

On the night of April 7, 2009, three men and two women drove Dominguez and the complainant to the business warehouse complex where Grenas's shop was located. The assailants then forced Dominguez to knock on the door of Grenas's shop, but no one answered. At about the same time, Dominguez heard a car drive into the parking lot. He then heard one gunshot, and he turned to see appellant shooting at him and the complainant. Dominguez saw the complainant, who was standing behind him, get shot and "fall[] to the ground." Appellant also shot Dominguez, and the two men fell to the ground together. Dominguez noted that he was shot nine times.

Jose Rene Martinez testified that at 11:40 p.m. on April 7, 2009, he drove his red pickup truck into a parking space at the same warehouse complex in which Grenas's shop was located, and he saw about eight people in the parking lot. Before he could get out of his pickup truck, appellant walked up, touched a gun to the driver's window, and asked him if he was the "coyote." Although Martinez told appellant that he was not the "coyote," appellant insisted that he was the "coyote." Appellant then pulled Martinez out of his pickup truck and pointed the gun to his head. When another man hit Martinez on his head with a gun, Martinez fell to the ground and then heard gunshots. He noted that the man who shot Dominguez and killed the complainant ordered appellant to shoot Martinez. Appellant then shot Martinez one time in the back with a handgun. Martinez

4

pretended that he was dead and heard the men drive away. Martinez explained that a Houston Police Department ("HPD") sergeant showed him a photographic array and asked him if he could identify anyone from the shooting. Martinez selected the photograph of appellant as the man who got him out of his pickup truck and shot him, explaining that he was only "sixty percent" sure that it was appellant because he was wearing a hat at the time of the shooting. And Martinez identified appellant in court as the man who shot him.

Wendy Cabieles testified that on April 4, 2009, she met appellant, whose street name is "El Gato," through his friends known by the street names of "Pachuco" and "Chino." On April 6, a man, whose street name was "Francolo," his girlfriend, known by the street name "La Flaca," Pachuco, and his girlfriend, Maria, were all at Cabieles's apartment. Francolo and Pachuco left and, at midnight, Francolo telephoned Cabieles and asked her to come to a club to meet two "coyotes," who wanted to pay for prostitutes. She explained that Francolo wanted to "steal" the undocumented immigrants from the "coyotes" and promised to pay her if she helped get information from the two men regarding the location of the immigrants. Cabieles drove to the club, where she met Dominguez and the complainant outside before they drove to "a cantina." She told Dominguez that her name was "Jacqueline." Cabieles left the cantina with Dominguez, and another woman, Maria, left with the complainant. They eventually drove to Cabieles's

5

apartment, with appellant and a man known as "El Flaca" following them. When they arrived, Francolo and La Flaca were already there and appellant, Pachuco, Chino, and El Flaca came in shortly thereafter. The men took the complainant into the bedroom with Dominguez, and appellant, Pachuco, and El Flaca beat the men, demanding to know the location of the undocumented immigrants. Dominguez eventually agreed to show the assailants the location of the immigrants. Appellant's brother, Alex, a man named Brian, and a man known as "El Guero" then arrived to help to plan and "steal" the undocumented immigrants.

Cabieles further testified that several of the assailants drove Dominguez to the business warehouse complex so he could show them the location of the undocumented immigrants. Later that evening, Cabieles drove appellant, Pachuco, Dominguez, and the complainant back to the same warehouse complex. El Flaca and Chino drove separately in a van, Brian drove in a car, and Alex drove Maria in Cabieles's Ford Expedition so they would have vehicles in which to transport the undocumented immigrants. Cabieles noted that Francolo and Pachuco had rifles, appellant had a silver handgun, and Chino had a black handgun. After the assailants, Dominguez, and the complainant approached the door of Grenas's shop, Cabieles saw a red pickup truck pull into the parking lot. She then heard gunshots and saw appellant hitting the driver of the red pickup truck with his silver handgun. Cabieles then drove appellant, La Flaca, and either El Flaca or Brian away from

6

the scene. Cabieles explained that she knew that the men had shot someone because appellant asked Pachuco why he had shot at someone. Pachuco told him that if he had not killed them, the men would have killed them instead.

Harris County Medical Examiner Dr. Kathryn Haden-Pinneri testified that she performed an autopsy on the complainant's body and prepared a report with her findings. She explained that the complainant had suffered multiple injuries, including abrasions on his face and head caused by a blunt object, and three gunshot wounds: one to his left chest, one to the back side of his left arm and into the chest, and one to his left-upper back. Haden-Pinneri opined that the gunshot wounds caused the death of the complainant.

## Lesser-Included Offense

In his first issue, appellant argues that the trial court erred in denying his request to instruct the jury on the lesser-included offense of felony murder because "[t]he evidence here showed that [appellant] expressed surprise that someone was killed" and "[s]ome evidence exists in the record that would have permitted the jury to rationally find that [he] was guilty only of felony murder." The State argues that the trial court did not err in denying the requested instruction "because there is no evidence from which a rational jury could find appellant guilty of *only* felony murder."

7

At the charge conference, appellant requested that the trial court instruct the jury on the lesser-included offense of felony murder based on the following testimony from Cabieles:

[The State]:    And what did you know when you left that night?

[Cabieles]:     [Appellant] asked Pachuco why he had shot -- he shot at him.

[The State]:    And what did Pachuco say?

[Cabieles]:     Because if I wouldn't have killed them, they would have killed us.

Appellant asserts that this testimony constitutes some evidence that he did not have the specific intent to kill.

We employ a two-step process to determine if an instruction on a lesser-included offense should be given. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); *see also Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007). An offense is a lesser-included offense if:

(1)    it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2)    it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish the commission;

(3)    it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4)    it consists of an attempt to commit the offense charged or an otherwise included offense.

8

TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 2006). A defendant is entitled to a lesser-included offense instruction if proof of the charged offense includes the proof required to establish the lesser-included offense. *Ferrel v. State*, 55 S.W.3d 586, 589 (Tex. Crim. App. 2001); *Miller v. State*, 177 S.W.3d 177, 181 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). If this threshold is met, the second step then requires that we determine if there is some evidence in the record that would have permitted the jury to rationally find that if appellant was guilty, he was guilty only of the lesser-included offense of felony murder. *Hall*, 225 S.W.3d at 536; *Guzman v. State*, 188 S.W.3d 185, 188–89 (Tex. Crim. App. 2006); *Rousseau*, 855 S.W.2d at 673.

The distinguishing element between felony murder and capital murder is the culpable mental state of the offender, i.e., the intent to kill. *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999); *Rousseau*, 855 S.W.2d at 673. "Capital murder requires the existence of an 'intentional cause of death.'" *Rousseau*, 855 S.W.2d at 673 (quoting *Creel v. State*, 754 S.W.2d 205, 211 (Tex. Crim. App. 1988)). In contrast, in felony murder, "'the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying . . . felony . . . .'" *Id.* (alteration in original) (quoting *Rodriguez v. State*, 548 S.W.2d 26, 28–29 (Tex. Crim. App. 1977)). Stated another way, felony murder is an unintentional murder committed in the course of committing a felony. *See* TEX.

PENAL CODE ANN. § 19.02(b)(3) (Vernon 2011). Capital murder includes an intentional murder committed in the course of felony kidnapping.[2]  *Id.* at § 19.03(a)(2) (Vernon Supp. 2013). Thus, felony murder meets the statutory definition of a lesser-included offense of capital murder because it differs from the charged offense of capital murder only in the respect that it requires a lesser culpable mental state, and the first prong of the test is met. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(3); *Fuentes*, 991 S.W.2d at 272; *Rousseau*, 855 S.W.2d at 673.

In regard to the second step of the test for determining the appropriateness of an instruction on a lesser-included offense, we must consider all of the evidence presented at trial. *Rousseau*, 855 S.W.2d at 673. "Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge." *Bignall v. State*,

---

[2] A person commits the offense of "kidnapping" if the person "intentionally or knowingly abducts another person." TEX. PENAL CODE ANN. § 20.03(a) (Vernon 2011). The term "abduct" means "to restrain a person with the intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2) (Vernon 2011). Kidnapping becomes a completed offense when (1) a restraint is accomplished and (2) there is evidence that the actor had the specific intent to prevent liberation by secretion or the use or threatened use of deadly force. *Mason v. State*, 905 S.W.2d 570, 575 (Tex. Crim. App. 1995); *Brimage v. State*, 918 S.W.2d 466, 475–76 (Tex. Crim. App. 1994). Here, the State had the burden of proving that a restraint was completed and appellant evidenced a specific intent to prevent liberation by either secretion or deadly force. *See Brimage*, 918 S.W.2d at 475–76. An assailant need not restrain a victim for any certain period of time. *Sanders v. State*, 605 S.W.2d 612, 614 (Tex. Crim. App. 1980). And "[i]ntent [may] be inferred from the acts, words, and conduct of the accused." *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982).

887 S.W.2d 21, 23 (Tex. Crim. App. 1994). Although this threshold showing is low, "[i]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather, there must be some evidence directly germane to [the] lesser-included offense for the factfinder to consider before an instruction on [the] lesser-included offense is warranted." *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). Accordingly, the standard may be satisfied if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations. *Robertson v. State*, 871 S.W.2d 701, 706 (Tex. Crim. App. 1993).

We note that the jury was charged on the law of parties.[3] Under the law of parties, a person is "criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01 (Vernon 2011). A person is "criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *See id*. § 7.02(a)(2) (Vernon 2011). The trial court's charge

---

[3] A defendant may be convicted of capital murder under the law of parties. *See Valle v. State*, 109 S.W.3d 500, 503–04 (Tex. Crim. App. 2003); *see also Whitmire v. State*, 183 S.W.3d 522, 526–27 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (evidence sufficient to support conviction for capital murder where defendant should have anticipated murder during armed robbery).

11

authorized the jury to find appellant guilty of capital murder on any of three theories of capital murder: as a principal, as a party under section 7.01, or as a party under section 7.02(a)(2).

The evidence reveals that appellant and a group of individuals kidnapped and beat Dominguez and the complainant. During the commission of the kidnapping, appellant hit Martinez with his gun before shooting him in the back. The record also reveals that someone fired at least twelve bullets at Dominguez and the complainant, killing the complainant and seriously wounding Dominguez. And Dominguez testified that before the shooting, appellant showed his face to him and the complainant and told them that he would kill them if anything went wrong at Grenas's shop. Dominguez also identified appellant as the man who shot at him and the complainant. Moreover, Cabieles testified that appellant was in the group of individuals who kidnapped and beat Dominguez and the complainant and that he had a silver handgun before and after the shooting. And Cabieles saw appellant hit Martinez with the silver handgun. Also, Martinez identified appellant from a photographic array, and testified that he was the man who pulled him out of his truck at gunpoint and shot him in the back.

Appellant asserts that Cabieles's testimony that he asked Pachuco "why he had shot" constitutes some evidence "that indicates that [he] only intended to commit kidnapping" and the fact that he asked his co-actor "why he had shot,"

12

"indicat[es] that shooting was not part of the plan" and "he did not shoot anyone himself." Appellant further asserts that the State did not offer any evidence that he "pull[ed] the trigger" or "formed the specific intent to kill." However, the State offered evidence that appellant first hit Martinez with his gun and then shot him in the back. And Dominguez testified that appellant was the man who shot him and the complainant.

Cabieles's testimony that appellant asked Pachuco afterward "why he had shot" does not constitute evidence that he did not intend to kill Martinez at the time that he shot him in the back or that he did not have the intent to cause the complainant's death. The evidence indicates that appellant was in the course of committing a kidnapping when he shot Martinez and when either appellant or one of the other kidnappers shot Dominguez nine times and also shot and killed the complainant. Moreover, there is no requirement in the case of a capital murder committed in the course of a kidnapping that the intent to cause death be premeditated or formulated before the actual commission of the kidnapping. *See Rousseau*, 855 S.W.2d at 674–75. We conclude that there is no evidence that would permit a rational jury to find that appellant was guilty only of the lesser-included offense of felony murder. Accordingly, we hold that the trial court did not err in denying appellant's request for a jury instruction on the lesser-included offense of felony murder.

We overrule appellant's first issue.

## Jury Argument

In his second issue, appellant argues that he was denied the right to counsel at trial because the trial court improperly limited his jury argument addressing the "inherent weakness of eyewitness identification testimony[.]" Appellant asserts that the United States and Texas Constitutions guarantee him the right "to have his counsel make that particular argument to the jury." *See* U.S. CONST. amend VI; TEX. CONST. art. I, § 10.

Appellant's complaint is based on the following exchange that occurred during his trial counsel's argument:

| | |
|---|---|
| [Appellant's Counsel]: | You heard on voir dire the concern that people expressed about how many people have been found innocent who were found guilty and served long terms in prison. How did that happen? Well, I think every -- |
| [The State]: | I'm going to object. It's outside the scope of the evidence. |
| THE COURT: | Sustained. |
| [Appellant's Counsel]: | Well, let me suggest how. |
| [The State]: | I'm going to object to any suggestions by counsel of things outside the record. |
| THE COURT: | Sustained. |

| [Appellant's Counsel]: | Eyewitness identification. . . . Without a shred of scientific evidence leads to -- |
|---|---|
| [The State]: | I'm going to object, Your honor. It's improper. It's outside the scope of the evidence. |
| THE COURT: | Sustained. |

Appellant's trial counsel went on to argue to the jury at length that there is no scientific evidence connecting appellant to the crime, the only eyewitness testimony presented at trial came from an accomplice "purchasing her freedom" with her testimony, and Martinez had testified that he was only "[sixty] percent sure" that it was appellant who shot him. Appellant also argues that Dominguez was not credible because he initially testified that he did not know Grenas, but later acknowledged that he had Grenas's telephone number in his cellular telephone and Grenas sometimes gave him money. Thus, the record reveals that trial counsel was able to argue that the eyewitness testimony in this case was flawed.

More importantly, appellant did not challenge, at trial, any limitation on his closing argument to the jury on any constitutional grounds, state or federal, by objecting that he has been denied his right to counsel. To preserve error for appellate review, a party must: (1) make a timely, specific objection; (2) the objection must be made at the earliest possible opportunity; (3) the complaining party must obtain an adverse ruling from the trial court; and (4) the issue on appeal

15

must correspond to the objection made at trial. *See* TEX. R. APP. P. 33.1(a); *Saldano v. State*, 70 S.W.3d 873, 887 (Tex. Crim. App. 2002) (stating that all but most fundamental rights may be forfeited if not objected to at trial). This is true even though the error of which appellant now complains on appeal concerns his constitutional rights. *Saldano*, 70 S.W.3d at 889; *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990). Specifically, appellant made no argument to the trial court as he presents on appeal that the trial court limited his argument regarding eyewitness identification as being inherently flawed or that any such limitation on his argument denied his right to counsel. Nor did appellant preserve the issue with either an offer of proof or formal bill of exception. *See* TEX. R. EVID. 103(a)(2); TEX. R. APP. P. 33.2. Accordingly, we hold that appellant has waived this issue.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).